INTERSTATE COMMERCE COMMISSION *v.*
J–T TRANSPORT CO., INC., ET AL.

No. 17. Argued October 17–18, 1961.—Decided December 4, 1961.*

*Together with No. 18, *U. S. A. C. Transport, Inc., et al.* v. *J–T Transport Co., Inc., et al.,* on appeal from the same Court, argued October 17–18, 1961; No. 49, *Atchison, Topeka & Santa Fe Railway Co. et al.* v. *Reddish et al.,* No. 53, *Interstate Commerce Commission* v. *Reddish et al.,* and No. 54, *Arkansas-Best Freight System, Inc., et al.* v. *Reddish et al.,* on appeal from the United States District Court for the Western District of Arkansas, argued October 18, 1961.

82

*B. Franklin Taylor, Jr.* argued the cause for appellant in No. 17. With him on the briefs were *Robert W. Ginnane* and *James Y. Piper.*

*Roland Rice* argued the cause for appellants in No. 18. With him on the briefs were *John C. Bradley* and *James E. Wilson.*

*Richard A. Solomon* argued the cause for the United States in all five cases. With him on the briefs were *Solicitor General Cox* and *Assistant Attorney General Loevinger.*

*James W. Wrape* argued the cause for J–T Transport Co., Inc., appellee in Nos. 17 and 18. With him on the briefs was *Glen M. Elliott.*

*Clarence D. Todd* filed a brief for Contract Carrier Conference of American Trucking Assns., Inc., appellee in Nos. 17 and 18.

A brief, urging affirmance, was filed in No. 17 by *John S. Burchmore* and *Robert N. Burchmore* for the National Industrial Traffic League, as *amicus curiae.*

*Robert W. Ginnane* argued the cause for appellant in No. 53. With him on the brief were *B. Franklin Taylor, Jr.* and *Arthur J. Cerra.*

*Roland Rice* argued the cause for appellants in Nos. 49 and 54. With him on the briefs were *Rollo E. Kidwell, Amos M. Mathews* and *Ed White.*

*A. Alvis Layne* argued the cause for appellees other than the United States in Nos. 49, 53 and 54. With him on the briefs for Elvin L. Reddish was *John H. Joyce.*

Mr. Justice Douglas delivered the opinion of the Court.

These are appeals from judgments of three-judge district courts, 28 U. S. C. § 1253, which set aside orders of the Interstate Commerce Commission denying applications for permits as contract carriers. 185 F. Supp. 838; 188 F. Supp. 160.

Appellee J–T Transport Company asked to extend its present operations as an irregular-route contract carrier of airplane parts to include carriage of aircraft landing gear bulkheads for Boeing Airplane Co. Boeing supported the application. Common carriers opposed the application, as did another carrier, U. S. A. C. Transport, Inc., appellant in No. 18. Boeing indicated it preferred

the applicant over the other because of its unsatisfactory experience with the latter in other operations. Boeing indicated that contract carriage was more practicable in its experience than common carriage, as a contract carrier's operations could be better integrated with a manufacturer's production. Though the examiner recommended a grant of the permit, the Commission denied it (74 M. C. C. 324, 79 M. C. C. 695) saying that no attempt had been made to ascertain if the existing services were capable of meeting the needs of the shipper. It ruled that "There is, in effect, a presumption that the services of existing carriers will be adversely affected by a loss of 'potential' traffic, even if they may not have handled it before." 79 M. C. C. 695, 705. It held that the applicant had not established a need for this contract service and that the applicant had not shown "the existing service" of the other carrier to be "inadequate." *Id.*, 709. It indicated that a service "not needed" cannot be found consistent with the public interest or the National Transportation Policy, as those terms are used in § 209 (b) of the Interstate Commerce Act as amended, 71 Stat. 411, 49 U. S. C. § 309 (b). It said that the shippers did not require a distinct type of service that could not be provided by the protesting carrier, which was indeed in a position to provide any service needed and which would be adversely affected by a grant of this application, even though it never had had the business in question.

Appellee Reddish made application to carry canned goods as a contract carrier from three points in Arkansas and one in Oklahoma to various points in thirty-three States and to carry other goods on return. His application was supported by his prospective shippers and opposed by motor common carriers, appellants in No. 54, and by rail common carriers, appellants in No. 49.

Reddish showed that he delivered to customers who ordered goods in less-than-truckload amounts. These

customers maintained low inventories and needed expedited deliveries in small quantities and on short notice. Some accepted deliveries only on certain days, a requirement calling for integration and coordination between shipper and customer. The shippers said that common carriage was an inadequate service for these shipments, as they were in such small lots that they often had to be carried in consolidated loads which caused delays in shipments. Moreover, it was shown that not all points would be served by one common carrier, making it necessary to unload the shipments and reload them on another carrier causing delays, misconsignment, and damage to goods. The shippers also testified that the cost of common carriage was prohibitive for less-than-truckload shipments and that if the Reddish application were denied they would use private carriage. The protesting motor common carriers testified they could render adequate service for these shipments and provide multiple pick-up and delivery services to most of the points by transferring the shipments to other carriers. The Examiner recommended that the application be granted. The Commission denied it, saying, *inter alia,* that the services needed by the shippers could be performed by existing common carriers, that they would be injured by the loss of potential traffic, and that the shippers' desire to obtain lower rates for less-than-truckload shipments was the primary reason for their support of the application, but was not a sufficient basis to justify a grant of authority to this contract carrier. 81 M. C. C. 35.

The cases turn on the meaning of language added to the Act in 1957.

Our decision in *United States* v. *Contract Steel Carriers,* 350 U. S. 409, held that a contract carrier, rendering a specialized service in the sense that it hauled only a limited group of commodities over irregular routes, did not become a common carrier because it reached for

new business within the limits of its license. That decision caused concern to the Commission which proposed amendments to the Act.[1] It proposed that § 203 (a)(15) be amended so as to define a contract carrier as one who engages in transportation by motor vehicle "under continuing contracts with one person or a limited number of persons for the furnishing of transportation services of a special and individual nature required by the customer and not provided by common carriers." It also proposed that § 209 (b) be amended by adding an additional requirement for issuance of a contract carrier permit, viz., "that existing common carriers are unwilling or unable to provide the type of service for which a need has been shown."

These amendments were vigorously opposed in some quarters.[2] The addition to § 203 (a)(15) was objected to on the ground that many contract carriers would be driven out of business because they could not meet the test of performing a service "not provided by common carriers." The change in § 209 (b) was opposed because it would be impossible for a contract carrier to prove that competing common carriers were "unwilling" to render the service and very difficult for it to prove that common

---

[1] Hearings, S. 1384, Subcommittee of Committee on Interstate and Foreign Commerce, 85th Cong., 1st Sess., p. 6.

[2] The proposed amendments were objected to by the Department of Justice as being "unduly restrictive" (S. Hearings, Subcommittee of Committee on Interstate and Foreign Commerce, 85th Cong., 1st Sess., p. 11) and in part by the Department of Commerce. Id., 200–203. They were also opposed by the Contract Carrier Conference that stated, inter alia, "Since the state of mind of the common carriers concerning their willingness is a matter peculiarly within their own knowledge, it would be absolutely impossible for a contract carrier to ever prove to the contrary. Furthermore, it would be very difficult for a contract carrier or its supporting shipper, having no intimate knowledge of the business of opposing common carriers, to prove that such carriers were unable to perform a given service." Id., p. 303.

carriers were "unable" to render the service, as the applicant would have no intimate knowledge of the business of the opposing carriers.

The Commission bowed to these objections;[3] and the bill as it passed eliminated the proposed changes except the ones that changed the result of our decision in *United States* v. *Contract Steel Carriers, supra.*[4] Section 203 (a)(15), however, was amended, so far as material here, by adding to the description of the term "contract carrier by motor vehicle" one who furnishes "transportation services designed to meet the distinct need of each individual customer."[5] And § 209 (b) was amended by adding a sentence which sets forth five factors the Commission shall consider in determining whether the permit should issue:

"In determining whether issuance of a permit will be consistent with the public interest and the national trans-

---

[3] The change in the Commission's attitude is summarized as follows in S. Rep. No. 703, 85th Cong., 1st Sess., p. 4: ". . . the Commission, upon reflection, on the objections of contract and private carriers to the bill, concluded that in some respects S. 1384 would provide too rigid a pattern. It decided that the proposed requirement in section 209 (b) that additional permits could be issued only upon a showing that existing common carriers are unwilling or unable to render the required types of service should be withdrawn."

[4] That this change was made is clear. See S. Rep. No. 703, 85th Cong., 1st Sess., pp. 2–3, 6, 7; H. Rep. No. 970, 85th Cong., 1st Sess., p. 3.

[5] Sec. 203 (a)(15) as amended reads as follows:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

portation policy declared in this Act, the Commission shall consider (1) the number of shippers to be served by the applicant, (2) the nature of the service proposed, (3) the effect which granting the permit would have upon the services of the protesting carriers and (4) the effect which denying the permit would have upon the applicant and/or its shipper and (5) the changing character of that shipper's requirements." (Numerals added.)

It seems clear from these provisions that the adequacy of existing services is a criterion to be considered by the Commission, as it is instructed to consider "the effect which granting the permit would have upon the services of the protesting carriers," as well as the effect of a denial upon the shippers. Or to put the matter otherwise, the question of the need of the shipping public for the proposed service necessarily includes the question whether the extent, nature, character, and suitability of existing, available service makes the proposed service out of line with the requirements of the national transportation policy. But the adequacy of existing facilities or the willingness or ability of existing carriers to render the new service is not determinative. The "effect which denying the permit would have upon the applicant and/or its shipper and the changing character of that shipper's requirements" have additional relevance. This is a phase of the problem reflected in the broadened definition of a "contract carrier by motor vehicle"—one who furnishes transportation services "designed to meet the distinct need of each individual customer." § 203 (a)(15). It means, we think, that the "distinct need" of shippers for the new contract carrier service must be weighed against the adequacy of existing services. The Commission indulged in "a presumption that the services of existing carriers will be adversely affected by a loss of 'potential' traffic, even if they may not have handled it before." 79 M. C. C. 695, 705. The effect of the presumption is

in substance to limit competing contract carriage to services "not provided" by existing carriers—a provision that the Commission sought unsuccessfully to have incorporated into the Act. We see no room for a presumption in favor of, or against, any of the five factors on which findings must be made under § 209 (b). The effect on protesting carriers of a grant of the application and the effect on shippers of a denial are factors to be weighed in determining on balance where the public interest lies. The aim of the 1957 amendments, as we read the legislative history, was not to protect the *status quo* of existing carriers but to establish a regime under which new contract carriage could be allowed if the "distinct need" of shippers indicated that it was desirable.

We cannot assume that Congress, in amending the statute, intended to adopt the administrative construction which prevailed prior to the amendment.

By adding the five criteria which it directed the Commission to consider, Congress expressed its will that the Commission should not manifest special solicitude for that criterion which directs attention to the situation of protesting carriers, at the expense of that which directs attention to the situation of supporting shippers, when those criteria have contrary implications. Such a situation doubtless exists in these cases, for granting the permits might well have produced some consequences adverse to the protesting carriers, while denying them may just as certainly prove burdensome to the supporting shippers. Had the Commission, having drawn out and crystallized these competing interests, attempted to judge them with as much delicacy as the prospective nature of the inquiry permits, we should have been cautious about disturbing its conclusion.

But while such a determination is primarily a responsibility of the Commission, we are under no compulsion to accept its reading where, as here, we are convinced that it

has loaded one of the scales. By indulging in a presumption "that the services of existing carriers will be adversely affected by a loss of 'potential' traffic, even if they may not have handled it before," and by assigning to the applicants the burden of proving the inadequacy of existing services, the Commission favored the protestants' interests at the expense of the shippers' in a manner not countenanced by anything discoverable in Congress' delegation to it of responsibility.

It is argued that the Commission, in holding that U. S. A. C. is willing and able to render the service, did not rely on the presumption. We are, however, not convinced. The Commission seems to have placed the burden of proving inadequacy of existing services on the applicant, for it said that the applicant had not shown that the service of U. S. A. C. was "inadequate." 79 M. C. C. 695, 709. Such a burden is improperly placed on the applicant, as the rejection of the proposed amendment to § 209 (b) suggests. The capabilities of protesting carriers are matters peculiarly within their knowledge. In the *Reddish* case the Commission made the same error, as is evident from its statement that the "shippers have failed to show that they have been unable to obtain reasonably adequate service upon request." 81 M. C. C. 35, 42.

The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized need. If that is done, then the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants.

Moreover, as we read the Act, as amended in 1957, the standard is not whether existing services are "reasonably adequate." It is whether a shipper has a "distinct need"

for a different or a more select or a more specialized service. The protesting carriers must show they can fill that "distinct need," not that they can provide a "reasonably adequate service."

In the *Reddish* case the Commission ruled that the desire for lower rates offered by the applicant was irrelevant to a shipper's needs, that if the rates of existing carriers were too high, shippers should seek relief for their reduction. 81 M. C. C. 35, 42–43. We think the matter of rates is one factor to be weighed in determining the need for the new service. In a contest between carriers by motor vehicles and carriers by rail, we held in *Schaffer Transportation Co.* v. *United States,* 355 U. S. 83, that the ability of a particular mode of transportation to operate with a lower rate is one of the "inherent advantages" that one type may have over another within the meaning of the Act. 54 Stat. 899. By analogy, contract carriage may be more "economical" than common carriage by motor or rail within the framework of the national transportation policy, as it is defined in the Act [6]—"the Com-

---

[6] Congress in 1940 described the national transportation policy:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899.

mission's guide" to the public interest. *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 82. It would seem hardly contestable that if denial of the application meant, for example, that a shipper's costs of transportation would be prohibitive, the shipper had established a "need" for the more "economical" service. See *Herman R. Ewell Extension—Philadelphia,* 72 M. C. C. 645. This does not mean that the lawfulness of rates would be injected into certificate proceedings. The issue of whether or not the proposed service offers a rate advantage and if so whether such advantage establishes a "need" for the service that overrides counterbalancing considerations presents issues that fall far short of a rate proceeding.

We agree with the court in the *J–T Transport Co.* case that, while the 1957 amendments changed the result of our decision in *United States* v. *Contract Steel Carriers, supra,* by giving the Commission power to limit the number of contracts which a contract carrier can maintain, the amendments in other respects put the contract carrier on a firmer footing. That court said, "Under the statute a shipper is entitled to have his distinct needs met." 185 F. Supp. 838, 849. We agree. We also agree that though common carrier service is reasonably adequate and though another carrier is willing and able to furnish the service, a permit to a contract carrier to furnish this particular service still might be wholly consistent with the national transportation policy defined in the Act. For it is "the distinct need of each individual customer" that the contract carrier is designed to fill. § 203 (a)(15). And "the changing character" of the shipper's "requirements" is a factor to be weighed before denying the application. § 209 (b). Hence the adequacy of existing services for normal needs and the willingness and ability of an existing carrier to render the service are not the end of the matter. The "distinct need" of the shipper may nonetheless not be served by existing

services, if the new service is better tailored to fit the special requirements of a shipper's business, the length of its purse, or the select nature of the delivery service that is desired. The fact that the protesting carriers do not presently perform the service being tendered and that the grant of the application would not divert business from them does not necessarily mean that the grant would have no effect "upon the services" of the protesting carriers within the meaning of § 209 (b). But where the protesting carriers do not presently have the business, it would seem that the grant of it to a newcomer would have an adverse effect on them only in the unusual case.

We intimate no opinion on the merits, for it is the Commission, not the courts, that brings an *expertise* to bear on the problem, that makes the findings, and that grants or denies the applications. Yet that *expertise* is not sufficient by itself. Findings supported by substantial evidence are required. *Public Service Comm'n* v. *United States*, 356 U. S. 421, 427; *United States* v. *United States Smelting Co.*, 339 U. S. 186, 193.

Since the standards and criteria employed by the Commission were not the proper ones, the causes must be remanded for further consideration and for new findings. *American Trucking Assns.* v. *United States*, 364 U. S. 1, 15–17. Accordingly the judgments below are

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.*

These are related appeals from a decree of a District Court setting aside an order of the Interstate Commerce Commission denying an application for a contract-carrier permit under the 1957 amendments to §§ 203 (a)(15) and

---

*[This opinion applies to No. 17, *Interstate Commerce Commission* v. *J–T Transport Co., Inc.*, and No. 18, *U. S. A. C. Transport, Inc.*, v. *J–T Transport Co., Inc.*]

209 (b) of the Interstate Commerce Act, 49 U. S. C. §§ 303 (a)(15), 309 (b). At issue are the District Court's determinations that the Commission exceeded its authority under those provisions in four particulars. First, by considering the adequacy of existing carriage for the transportation service proposed, the Commission is said to have injected an inadmissible "sixth criterion" into the five factors designated by Congress in the revised § 209 (b). Second, the Commission was held to have imposed on the applicant a burden of proving the inadequacy of existing services that Congress had specifically refused to approve. Third, the court concluded that the Commission's reliance on the capacity of existing carriers to meet the "reasonable transportation needs" of the shipper did not meet the standard of specific needs in amended § 203 (a)(15). Fourth, the Commission is charged with invoking an impermissible presumption that an existing carrier willing and able to perform a transportation service it has not previously undertaken will be adversely affected by the loss of potential traffic.

Disposition of these conclusions turns first on a construction of the 1957 amendments in the context of the Motor Carrier Act of 1935, apart from which they are unintelligible; next upon due consideration of what the Commission has here undertaken to do, as disclosed in a fair reading of its final report denying the application; and, most importantly, on appropriate regard for the limits on judicial review of such Commission action as is now before us.

## I.

The Motor Carrier Act, this Court has noted, was passed at a time when "the industry was unstable economically, dominated by ease of competitive entry and a fluid rate picture. And as a result, it became overcrowded with small economic units which proved unable to satisfy even the most minimal standards of safety

or financial responsibility. So Congress felt compelled to require authorization for all interstate operations to preserve the motor transportation system from over-competition . . . ." *American Trucking Assns.* v. *United States,* 344 U. S. 298, 312–313.

These were indeed the conditions that prompted legislative recommendations by the greatly esteemed Federal Coordinator of Transportation, Joseph B. Eastman. See S. Doc. No. 152, 73d Cong., 2d Sess. (1934). One of the prime purposes of the measure he proposed was to control the number and scope of contract-carrier operations in order to preserve and protect common-carrier service:

> "These private and contract carriers might be ignored if they did not have a tendency to demoralize or impair the system of common carriage which undertakes to serve all alike and is of prime importance to the country. . . .
>
> "The contract carrier may differ from the common carrier only in the fact that he undertakes to skim the cream of the traffic and leave the portion which lacks the butterfats to his common-carrier competitor. Obviously such operations can have very unfortunate and undesirable results.
>
> ". . . So far as regulation is directed against private and contract operators, it should be for the chief purpose of protecting the common carriers against unfair and demoralizing competition." Report of the Federal Coordinator of Transportation, 1934, H. R. Doc. No. 89, 74th Cong., 1st Sess. 17 (1935).

Coordinator Eastman's proposal was enacted by Congress into the Motor Carrier Act of 1935 (now Interstate Commerce Act, Part II). See H. R. Rep. No. 1645, 74th Cong., 1st Sess. 5 (1935); S. Rep. No. 482, 74th Cong., 1st Sess. 2 (1935). As enacted, it laid far more stringent controls upon common carriers than on contract carriers.

The former were required to hold themselves out to the general public, §§ 203 (a)(14), 207, under just and non-discriminatory tariffs, §§ 216 (d), 217, while the latter were uncontrolled in their charges above a reasonable minimum, § 218. Motor carriers owning more than 20 vehicles, which presumably included most common carriers and few if any contract carriers, had to obtain Commission approval before going out of business, Interstate Commerce Act, Part I, § 5, and see 49 CFR §§ 179.2–179.5 (1961). No limitation was laid on the types of traffic for which contract carriers could compete, and indeed there has never developed any inherent difference in the operations performable by common or contract carriers.[1] Instead, Congress chose to protect common carriers from destructive competition by entrusting the Interstate Commerce Commission with the administration of certain generalized qualifications needed to obtain a contract-carrier permit.

As originally enacted, 49 Stat. 543, 544 (1935), § 203 (a)(15) provided:

> "The term 'contract carrier by motor vehicle' means any person, [other than a common carrier] . . . , who or which, under special and individual contracts or agreements, and whether directly or by a lease or any other arrangement, transports passengers or property in interstate or foreign commerce . . . ."

Section 209 (b), as enacted by 49 Stat. 543, 553 (1935), authorized the Commission to issue permits to contract carriers when it appeared, *inter alia,*

> ". . . that the proposed operation, to the extent authorized by the permit, will be consistent with

---

[1] The Commission has classified motor carriage by 17 types of commodities, and each one admits of common or contract carriage. 49 CFR § 165.2 (1961).

the public interest and the policy declared in section 202 (a) of this part [the 1935 forerunner of the National Transportation Policy adopted in 1940] . . . ."

The design of these sections was explicated by the Commission shortly after their passage, in *Contracts of Contract Carriers,* 1 M. C. C. 628 (1937). This was a rule-making proceeding under § 209 (b) to attach limitations to contract-carrier permits in order to forestall transgression upon common carriage. The reasons given for promulgation of the rule afford persuasive evidence of the contemporaneous understanding of the Act:

"The term 'contract carrier' was coined in State statutes for the regulation of motor carriers. In a number of these statutes, protection of the common carrier was expressly recited as the purpose of regulating the contract carrier. In others, this purpose appeared by necessary implication. . . .

"This principle is inherent in the Motor Carrier Act, 1935. The underlying purpose is plainly to promote and protect adequate and efficient common-carrier service by motor vehicle in the public interest, and the regulation of contract carriers is designed and confined with that end in view. . . .

". . . . The patent object of Congress is to protect the common carriers against cut-throat competition." 1 M. C. C., at 629. See also *Filing of Contracts by Contract Carriers,* 20 M. C. C. 8, 11 (1939).

After reciting the relative freedom from regulation enjoyed by contract carriers, the Commission concluded, in terms peculiarly appropriate to the present controversy:

"This inherent and inevitable disadvantage of the common carriers is accentuated and becomes a source of positive peril to them when competitors, claiming to be contract carriers, are promiscuous in their deal-

ings with shippers [who] . . . may play the contract carrier against the common carrier . . . with the result that the unfair and destructive competition which Congress sought in the act to abate is instead intensified . . . ." 1 M. C. C., at 631.

## II.

In acting upon applications for contract-carrier permits, the Commission has from the beginning regarded the adequacy of existing common-carrier facilities to be of crucial importance in determining consistency with the public interest as defined by the history and purposes of the Act. In *C. & D. Oil Co. Contract Carrier Application,* 1 M. C. C. 329, 332 (1936), it early stated a guiding principle that has been reaffirmed many times since:

"We think that, in order to foster sound economic conditions in the motor-carrier industry, existing motor carriers should normally be accorded the right to transport all traffic which they can handle adequately, efficiently, and economically in the territories served by them, as against any person now seeking to enter the field of motor-carrier transportation in circumstances such as are here disclosed."

A review of Commission action from 1935 to 1957 discloses that this principle has been unwaveringly applied in circumstances identical or nearly so to those in the present case, and that its application has produced consistent rulings exactly akin to those now challenged here.

*C. & D. Oil Co. Contract Carrier Application, supra.* The desire of a shipper to engage the services of a particular carrier, although based on sound and legitimate business reasons, does not control decision as to transportation needs, and is not, standing alone, enough to require a finding that the proposed service would be consistent with the public interest or national transportation policy.

*R. L. Smith Contract Carrier Application*, 1 **M. C. C.** 717 (1937). Applicant proposed to carry only peak-load supplies not presently carried by protestant common carriers, but the permit was denied because the existing carriers "may augment their facilities at will through the purchase or lease of additional equipment and may thereby furnish such emergency service." (At 719.) A loss of potential traffic was thus made determinative.

*Eastern Shore Oil Co. Contract Carrier Application*, 7 M. C. C. 173, 175–176 (1938). There were several common carriers with authority and facilities to handle the proposed traffic, although none had in fact ever carried any of it. The Commission concluded that no need for the service had been shown, consistent with the public interest and the national transportation policy, and reaffirmed its ruling in *C. & D.* that the desire of a shipper to engage a particular carrier was insufficient ground for the granting of a permit.

*William Heim Cartage Co., Extension of Operations—Indianapolis*, 20 M. C. C. 329 (1939). Applicant proposed to dedicate three trucks to shipper's exclusive use. There was testimony that existing common carriers had the capacity to undertake the traffic. The shipper sought to overcome this by claiming (1) that because of the variety of goods shipped, common-carrier rates would be prohibitive, and (2) that if the application was denied, the shipper would not use common-carrier service but would probably initiate private carriage. Nevertheless the Commission denied the permit, holding that the burden was on the applicant to show that its proposed service "would tend to correct or substantially improve" a deficiency in existing service. The "mere desire" of a shipper to engage a particular carrier was again rejected as a determining factor.

*Horace L. Daum Extension of Operations—Illinois*, 22 M. C. C. 366 (1940). Shipper had been using its own trucks, and supported this application by stating that, if refused, it would continue to use its own facilities. The protestant common carrier by motor vehicle had established that its equipment was not being operated to full capacity, and that it was able and willing to purchase additional equipment if needed. Reaffirming *C. & D.*, the Commission denied the permit.

*N. S. Craig Contract Carrier Application*, 31 M. C. C. 705 (1941). The Commission had before it the amendments introduced by the Transportation Act of 1940, and had to determine whether the lines it had theretofore drawn were altered by the deletion of the word "special" from § 203 (a) (15)[2] or by the adoption of the National Transportation Policy in its present form.[3] It concluded from an examination of the legislative history that, far from there being a change, Congress had approved the distinctions employed by the Commission,[4] which it restated in terms that are now unmistakably entrenched

---

[2] 54 Stat. 898, 920 (1940).

[3] The National Transportation Policy, added by 54 Stat. 898, 899 (1940), 49 U. S. C. preceding § 301, provides in relevant part: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges . . . without . . . unfair or destructive competitive practices . . . — all to the end of developing . . . a national transportation system . . . adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

[4] Senator Truman, a Senate conferee, said in presenting the bill:

"Section 203, paragraphs (14) and (15), have been rewritten for the sole purpose of eliminating carriers performing pick-up, delivery, and transfer service. This change was suggested by the Chairman of the Interstate Commerce Commission.

"The conferees wish to make it plain that it is not their intention, by changing the language of paragraphs (14) and (15) of section 203 to change the legislative intent of the Congress one iota with respect to definition of common and contract carriers other than those performing pick-up, delivery, and transfer service. It is intended that all over-the-road truckers shall whenever possible fall within the description of common carriers.

"It is intended by the definition of contract carriers to limit that group . . . ." 86 Cong. Rec. 11546 (1940).

in the 1957 amendment to § 203 (a) (15) : "[T]he statutory definitions as now amended are essentially declaratory of the common law. In other words, the fact or not of a public holding out remains the final or ultimate test of common carriage." (At 710.) Numerous secondary tests had been used to distinguish contract carriage, but each shared a common feature: the criterion of *"specialization,* either in the nature of the physical operation, or in respect of the shippers served, without some showing of which contract carriage cannot be found to exist." (At 711; italics in report.) A carrier might engage in specialized operations and remain a common carrier if it held itself out to perform similar service for any shipper that might want it, but unless it did so specialize it could not be a contract carrier. The specialization the Commission had in mind

> ". . . might take the form of specialized physical operations designed to meet the peculiar needs of particular shippers or might consist in the rigid devotion of an otherwise ordinary physical service to a single shipper or very limited number of shippers." (At 708.)

This, it will be seen, is an almost literal paraphrase of what later emerged as the 1957 amendment to § 203 (a) (15).

Having anticipated explicit congressional purpose in this manner, the Commission continued to adhere to its earlier rulings as consistent with that purpose.

*Samuel I. Major Contract Carrier Application,* 43 M. C. C. 795, 799–800 (1944). No showing of consistency with public interest when there are common carriers authorized, equipped, and willing to handle the traffic.

*Willard J. Hibbard Extension of Operations—Lime,* 47 M. C. C. 311 (1947). Shipper emphatic that only a contract carrier will do, and that it will not use the services of a common carrier. The Commission found from the evidence that existing common carriers could satisfactorily perform the job: "The fact that existing carriers have not participated in the traffic, in the absence of any showing that they are unable or unwilling to provide a service as required, does not warrant a grant of authority to a new carrier." (At 314.)

102

*B & F Bus Service, Inc., Contract Carrier Application*, 53 M. C. C. 501 (1951). In a situation remarkably like the present one, the Commission devised and applied criteria virtually identical to those adopted by Congress in its 1957 amendment to § 209 (b), and denied the application. The contract carrier there proposed an express bus service for the employees of a plant in Clifton, New Jersey, to carry them back and forth from New York. The protestant common carriers established that one or another of them could carry the passengers within two miles of the plant where they could obtain a transfer on a local crosstown bus to and from the plant. Two protestants offered to run an express service if 30 passengers could be assured. Each protestant was desirous of obtaining the traffic and thought it necessary for his business to do so.

In resolving the issue, the Commission foresaw the essentials of the third and fourth criteria now explicitly commended to their consideration by Congress in § 209 (b) :

> "Before the proposed operation may be authorized it must be found consistent with the public interest and the national transportation policy. Among the factors to be considered in making such determination are (1) the manner and extent such service will affect the operations of competing common carriers and their patrons, (2) the nature and extent of the inconvenience prospective patrons of the proposed contract-carrier service will suffer if it is not authorized and, conversely, the benefits such service will afford them, and (3) the ascertainment of the public interest from a weighing of these respective facts."
> (At 504–505.)

Applying this formula to that case, the Commission determined that the potential damage to the common-carrier protestants from loss of a new service and others like it in the future, outweighed the advantage in convenience offered by the contract-carrier applicant. The terms in which it drew the balance are of especial pertinency to our controversy:

> "[W]here a proposed contract-carrier service would substantially impair the common-carrier service upon

which the public generally must rely, either immediately or potentially through a weakening of the financial ability of the common carriers to meet the needs of the public, issuance of a permit would be found inconsistent with the public interest." (At 505.)

This mode of adjusting conflicting interests whose accommodation was later explicitly committed to the Commission by Congress furnishes strong evidence of the way in which those factors are appropriately evaluated. Subsequent rulings afford impressive proof of this uniform administrative practice.

*Kilmer Transp. Co. Extension—Uniontown*, 53 M. C. C. 561 (1951). This is another case very close to the present one on its facts. Shippers of fragile earthenware products, requiring special handling and equipment, desired to use a contract carrier which had designed special trailers, trained experienced drivers, and proposed to dedicate its equipment to the exclusive use of the shippers. There were a number of common carriers authorized and with the capacity to carry this traffic. The shippers had experienced some delays with common carriage and wished the flexibility proposed by the applicant of picking up portions of a load at different factories. The application was denied, the Commission stating that "In the absence of a showing that the proposed service would provide shipper with something substantial in the way of service which existing carriers are unable or unwilling to provide, the application must be denied." (At 571.)

*Beatty Motor Express, Inc., Extension—Soap to Pittsburgh, Pa.*, 66 M. C. C. 160 (1955). The application was supported by a shipper who had had a satisfactory experience with the applicant and wished to continue its service. In refusing the requested permit, the Commission recapitulated the standards it was applying, clarifying especially the matter of burden of proof:

"It is clear from the record that existing carriers have the authority, equipment, and facilities necessary to transport all of the considered commodities from and to the points involved. . . . [N]or is there any showing that the proposed service is so unique ·or so specialized that the existing carriers are unable to

provide the supporting shipper with a reasonably satisfactory service. There is no doubt that a grant of authority to transport the involved soap products and preparations would be convenient to the supporting shipper, but the record is lacking in proof that the shipper will be prejudiced or handicapped unless the authority sought is granted. Past use of a motor-carrier service, coupled with the mere preference for the service of a particular carrier over that of existing carriers, is not sufficient to warrant a grant of authority. We have consistently held that existing carriers should be accorded the right to transport all traffic which, under normal conditions, they can handle adequately, efficiently, and economically in the territory served by them, without the competition of a new operation." (At 162.)

*Overland Freight Lines, Inc., Extension—Kentucky*, 69 M. C. C. 143, 148 (1956). An application was denied despite evidence that the placement of common carriers at the shipper's platform had involved delays requiring payment of overtime that raised costs on low-sales-value units of merchandise. "[W]e cannot reasonably conclude that their placements, as a whole, have been so unreasonably delayed or so inconveniently made as to merit a finding that the services of these carriers have been inadequate." Past diligence and future willingness to spot equipment at the plant were shown and relied on to deny the application.

*Refiners Transport, Inc., Extension—Missouri,* 71 M. C. C. 272 (1957). Issuance of a permit was refused despite (1) evidence of three occasions of unsatisfactory shipment by the protestants, and (2) a statement by the consignee that it would do further business with the shipper only if the applicant's transportation service was obtained.

## III.

The law and practice governing contract-carrier applications, as it emerged from the language, history, and purposes of the Motor Carrier Act and from consistent administrative construction between 1935 and 1957, may be summarized as follows. Strictly regulated common car-

riage was considered the backbone of the motor transport industry. Contract carriers might be able to perform certain specialized transportation tasks more easily than common carriers, and when this was so they should be allowed to enter the field. In order to preserve the financial and operational capacity of common carriers to perform the variety of tasks required by the public, however, applicants for a contract-carrier permit must not be awarded business that existing common carriers are equipped and obliged in their certificates to handle. Accordingly, the applicant must first demonstrate that he proposes a specialized undertaking. Protestants may then present evidence that they have the capacity and the desire to carry the particular traffic proposed. If that is done, the burden shifts back to the applicant to demonstrate that the protestants are not so well equipped as he to meet the needs of the shipper. Shipper preference is not sufficient. Unless the applicant can show that its service will be substantially superior to that offered by the protestants, the issuance of a permit must be refused, and this although the protestant may never have carried the traffic before and may have no assurance that it will be offered him once the application is denied. Only thus, the Commission had concluded, could the policy of Congress to preserve a viable system of common carriage be satisfied.

It is this body of precedent, conscientiously developed over a period of years to effectuate the policies formulated in the Motor Carrier Act for Commission enforcement, that we are told was overturned by congressional amendment in 1957. And so we must turn to the terms, origin, and purpose of those amendments.

As now amended by 71 Stat. 411 (1957), § 203 (a)(15), 49 U. S. C. § 303 (a)(15) reads as follows:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor

vehicle of passengers or property in interstate or foreign commerce, for compensation [other than as a common carrier] . . . *under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."* (Changes italicized.)

71 Stat. 411 (1957) added to § 209 (b), 49 U. S. C. § 309 (b), the following provision:

"In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider [1] the number of shippers to be served by the applicant, [2] the nature of the service proposed, [3] *the effect which granting the permit would have upon the services of the protesting carriers and* [4] *the effect which denying the permit would have upon the* applicant and/or its *shipper* and [5] the changing character of that shipper's requirements." [5]

From the italicized changes it is said to follow that the Commission may no longer assign due weight, in its judgment, to the ability of existing common carriers to furnish substantially the transportation service proposed. This is so, it is argued, because factors [3] and [4] are placed in conjunctive equipoise, demanding a balance on untilted scales. And the fulcrum, to complete the metaphor, is located by this argument precisely at the "distinct need" of the shipper referred to in amended § 203 (a)(15).

---

[5] Bracketed numbers added for convenient reference. Only the third factor and so much of the fourth as is italicized are in issue here. The Commission considered the others, and no challenge is made to its disposition of them.

If the issue before us were only whether the language of the amendments could bear this construction, there would be little argument. But even if the suggested interpretation were supported by the plain meaning of the words, this would not advance our inquiry very far. For the "plain meaning" rule as an automatic canon of statutory construction is mischievous and misleading and has been long ago rejected. See *Boston Sand Co.* v. *United States,* 278 U. S. 41, 48; *United States* v. *American Trucking Assns.,* 310 U. S. 534, 542–550. Words are seldom so plain that their context cannot shape them. Once the "tyranny of literalness" is rejected, *United States* v. *Witkovich,* 353 U. S. 194, 199, the real meaning of seemingly plain words must be supplied by a consideration of the statute as a whole as well as by an inquiry into relevant legislative history. Indeed when there is need for aid, we may turn to "all the light relevantly shed upon the words and the clause and the statute that express the purpose of Congress," *United States* v. *Universal Corp.,* 344 U. S. 218, 221.

The starting point for determining legislative purpose is plainly an appreciation of the "mischief" that Congress was seeking to alleviate. In this instance, fortunately, it is not hard to find, for the Court itself exposed it in *United States* v. *Contract Steel Carriers,* 350 U. S. 409. The Commission had there determined that a contract carrier had, through active solicitation of some 69 transportation contracts, so expanded its business as to become indistinguishable in operation from a common carrier, and ordered it to cease and desist. This Court affirmed reversal of that order, relying on § 209 (b) as it was then written [6] to declare that "A contract carrier is free to

---

[6] Section 209 (b) then excluded from the limitations the Commission could impose, "the right of the carrier to substitute or add contracts within the scope of the permit." As amended after *Contract Steel,* 71 Stat. 411, 412 (1957), the section empowers the Commission to attach "terms, conditions and limitations respecting the person or

aggressively search for new business within the limits of his license." 350 U. S., at 412.

The latitude thus authoritatively recognized in contract carriers to engage essentially in common carriage without at the same time subjecting themselves to regulation as common carriers, was the mischief that prompted the Commission to seek a restrictive rewriting of §§ 203 (a)(15) and 209 (b). 70 I. C. C. Ann. Rep. 162 (1956). Chairman Clarke of the Commission testified in the Senate hearings on the Commission's proposed bill that, as matters then stood, contract-carrier expansion could impair the ability of common carriers to offer service to the general public, particularly to the small shipper who could not afford the services of a contract carrier. The Commission feared that the inherent advantages of contract carriers would permit them to "encroach upon the operations of the common carriers and skim off the cream of the traffic upon which they depend to support their overall service to the public." [7]

This clearly was the apprehended evil that prompted a favorable report of the amendments. S. Rep. No. 703, 85th Cong., 1st Sess. 1, 3, 7 (1957). As phrased in the House Report, the freedom accorded contract carriers in the *Contract Steel* decision "obliterates the distinction which Congress intended to make between common and contract carriers, and opens the door to unjust discrimination among shippers." H. R. Rep. No. 970, 85th Cong., 1st Sess. 3 (1957). In presenting the bill that was

---

persons and the number or class thereof for which the contract carrier may perform transportation service, as may be necessary to assure that the business is that of a contract carrier and within the scope of the permit . . . ."

[7] *Surface Transportation—Scope of Authority of I. C. C.*—Hearings before the Subcommittee on Surface Transportation of the Senate Committee on Interstate and Foreign Commerce, 85th Cong., 1st Sess. 23 (1957) (hereinafter cited as Senate Hearings).

adopted by Congress, Senator Smathers, the Senate Subcommittee Chairman, thus stated the need it was designed to fulfill:

"Unlimited diversion of traffic from common carriers to contract carriers could impair the common carriers' ability to render adequate service to the general public; consequently, a more precise definition of contract carriage in the Interstate Commerce Act is deemed necessary.

. . . . .

"The decision of the Supreme Court clearly means that the Congress should do something to correct the situation." 103 Cong. Rec. 14035, 14036 (1957).

The "more precise definition of contract carriage" in the resulting § 203 (a)(15) was plainly intended to restrict the opportunities of contract carriers, not to enhance them.

To be sure, the addition of the five criteria for Commission consideration in the amendment to § 209 (b) was not explicitly responsive to the *Contract Steel* decision. Neither the House nor the Senate Report makes any mention of the meaning or purpose of the addition. The criteria were not contained in the bills, S. 1384 and H. R. 5123, 85th Cong., 1st Sess. (1957), as initially proposed by the Commission. They emanated instead from a suggestion by the Contract Carrier Conference, an appellee in this case; and there is language in the testimony of its General Counsel, Clarence D. Todd, before the Senate Subcommittee, from which support is now drawn for the appellees' position:

"[T]he primary thing that we have always felt the Commission should do in those cases is consider not only the effect of granting this authority on the common carrier—they do that in each and every case—but to consider the effect denial will have on the con-

tract carriers; the public interest is something to be balanced, and we think that both of those matters should be taken into consideration." Senate Hearings 300.

These observations, it will be noted, did not address themselves to the effect of a denial on the shipper, which is at issue here. Consideration of the shipper's needs was not adverted to in the recommendations made by the Contract Carrier Conference, see Senate Hearings 305; it was added by the Subcommittee. In any event, the "balance" to be struck was not defined, nor the process by which it was to be determined. As a matter of fact, the contract carriers appear to have accepted the existing Commission practice; they neither asked for nor anticipated relaxation of it:

> "The amendment suggested by the contract carriers would still require proof that the proposed service is 'consistent with the public interest and the national transportation policy' but it sets forth certain matters which the Commission should consider in determining this question. We do not believe that this amendment would make it any easier for our contract carriers to obtain new authority . . . . All it would do would be to require the Commission to give consideration to factors which, in our opinion, are important to the public interest." Senate Hearings 304.

That this was Congress' understanding of the addition is evidenced by Senator Smathers' explanation in recommending its adoption: "In this, the Committee is proposing to give the Commission more helpful standards than are contained in the present law." 103 Cong. Rec. 14036 (1957). Like evidence is contained in a letter from Chairman Clarke to the House Committee, stating the Commission's belief "that H. R. 8825 [the bill amended by

the Senate as it eventually passed] is an improvement over H. R. 5123, submitted by the Commission in draft form." H. R. Rep. No. 970, 85th Cong., 1st Sess., Appendix (1957). This is hardly the language of a loser. If, in construing legislation, we are to look to the sponsors of a bill to determine its meaning, *Schwegmann Bros.* v. *Calvert Corp.*, 341 U. S. 384, 394–395, these statements should leave no doubt that the addition of the five criteria to § 209 (b) worked no change in the Commission's long-standing practice of preferring available common carriers to contract-carrier applicants.

These particularized indications are confirmed and reinforced by the legislative history as a whole for precluding the view, underlying the District Court's decision, that the 1957 amendments introduced a radical departure in regulatory policy. As we have seen, the Commission had, in advance of the amendments, developed and applied the criteria at issue in this case, and had struck the same balance there as here. *B & F Bus Service, Inc., Contract Carrier Application, supra.* Neither this leading Commission disposition, nor any other to the same effect, was criticized or even mentioned to the subcommittee that drafted the amended bill. Had the Commission, which maintained a representative throughout the Senate hearings, suspected that its practice in this regard was being overturned, it would scarcely have given the unqualified approval that it did to the final bill. See H. R. Rep. No. 970, 85th Cong., 1st Sess. 2 (1957); S. Rep. No. 703, 85th Cong., 1st Sess. 6 (1957); 103 Cong. Rec. 14035 (1957) (remarks of Sen. Smathers). On the contrary, it had good reason for assuming that its practice was being approved. The report that issued from the hearings contained the following endorsement:

"Your committee is of the opinion that the public interest in a sound transportation system, and particularly in a stable and adequate system of common

carriage, in the light of the objectives of the national transportation policy, require that the bill, as amended, be passed." S. Rep. No. 703, 85th Cong., 1st Sess. 7 (1957).

Furthermore, the very same session of Congress that passed the amendments here in issue also amended § 218 (a), by 71 Stat. 343 (1957), 49 U. S. C. § 318 (a), to require contract carriers to file actual rather than minimum rates or charges. This legislation was requested by the Commission, 70 I. C. C. Ann. Rep. 168–169 (1956), and recommended by Senator Smathers' Subcommittee, S. Rep. No. 335, 85th Cong., 1st Sess. 2 (1957), to eliminate a competitive advantage held by contract carriers. It should be construed *in pari materia* with the amendments to §§ 203 (a)(15) and 209 (b). That the 1957 Congress shared the original understanding of the Motor Carrier Act's purpose is manifested in the Senate Report, at 2:

"The underlying purpose of the Motor Carrier Act (pt. II of the Interstate Commerce Act) is the promotion and protection of adequate and efficient common-carrier service by motor vehicle in the public interest. The regulation of contract carriers was designed with that end, among others, in view."

IV.

The foregoing distillation of statutory purpose from the legislative history of the amendments is not affected by the deletion from the bill of language initially submitted by the Commission. In its original form, S. 1384 would have amended the definition of a contract carrier in § 203 (a)(15) to make it one engaging in transportation under contracts for the furnishing of special and individual services required by the customer "and not provided by common carriers." The Commission bill would have also amended § 209 (b) to require a showing by a

contract-carrier applicant "that existing common carriers are unwilling or unable to provide the type of service for which a need has been shown." [8] The quoted language was objected to by the Justice Department, Senate Hearings 10–11, and deleted by the Senate Subcommittee, S. Rep. No. 703, 85th Cong., 1st Sess. 3 (1957), as "unduly restrictive" of contract carriage. This does not affect construction of the amendments as they emerged in final form, so far as they are relevant to our problem. The fact that the Commission withdrew its initial suggestion for increased restrictions on contract carriage hardly affords the basis for a conclusion that existing restrictions were legislatively disapproved or narrowed.

In truth, the Commission's language was deleted because it was thought to place an impossible burden of proof on an applicant, of demonstrating a state of mind ("unwilling"), or of facilities ("unable"), entirely within the knowledge of the protestant. Thus, very early in the Senate hearings, before any other witness had been heard from, Chairman Clarke withdrew the "unwilling" language from the suggested amendment to § 209 (b) "because of the very difficult burden of proof that would be imposed on applicants . . . ." Senate Hearings 22. Later on, the representative of the Contract Carrier Conference asked for deletion of the "not provided" language, *supra,* from the amendment to § 203 (a)(15) because it presented the very same burden of proof problem. Senate Hearings 294–295. The Commission subsequently recommended this deletion because the language was "not necessary to carry out the purpose of the bill . . . ." Senate Hearings 43–44. See also S. Rep. No. 703, 85th Cong., 1st Sess. 5 (1957).[9]

---

[8] S. 1384 is printed at Senate Hearings 6.

[9] The only other light shed on the significance of the deletions is furnished in a colloquy in the course of the hearings:

"Senator SCHOEPPEL. I would like to ask a question right there: Supposing you had a common carrier serving certain territory but

## V.

An amendment is not to be read in isolation but as an organic part of the statute it affects. An amendment is not a repeal. Even when plain words are suggestive of a change in policy, they are not to be construed as such if there has been a history of consistent contrary legislative policy. *Boston Sand Co.* v. *United States,* 278 U. S. 41; *Guessefeldt* v. *McGrath,* 342 U. S. 308, 313–315.

The Interstate Commerce Committees that considered these amendments were addressing themselves to a limited problem laid bare by the *Contract Steel* decision. It would be heedless of the practicalities of legislative procedure to assume that these experienced committees chose to use the occasion to overturn a consistent pattern of statutory regulation without inviting the views of the

---

wasn't furnishing adequate service. There was common carrier service there, but of a very limited nature, and with the mode and extent of doing business nowadays would you draw the line there that the common carrier had to furnish reasonably adequate and prompt service?"

"Mr. ROTHSCHILD [from the Department of Commerce, deferred specific answer and then replied]. They should not be able to deny the application of a common [*sic*] carrier simply because someone claims that there is common carrier service there." Senate Hearings 200–201, 203.

What weight, if any, should be accorded this exploratory speculation between a single subcommittee member and a representative of a government department having no intimate familiarity with prior administrative practice, is problematical. Even giving it the fullest significance it can bear, however, the most that emerges is this: When a contract carrier applies for a permit, it is not enough for a protestant to show that it has authority to transport the proposed traffic. It must show also that it has the capacity and willingness to do so, and the Commission must be satisfied from all the evidence that, in Senator Schoeppel's words, the service it can perform is "reasonably adequate" to meet the shipper's needs. But this, it will be seen, is precisely the procedure that the Commission had invariably followed from 1935 to 1957.

Commission, without undertaking any review of Commission precedents, and without selecting language plainly evincing a purpose to change the law in this respect. To the contrary, it seems clear that these careful architects of motor-carrier regulation fashioned amendments that fit harmoniously into the prior law. They did not inadvertently add a colonial wing to a gothic cathedral.

## VI.

What has been said disposes of the contention that the Commission erroneously imported a "sixth criterion" of the adequacy of existing common-carrier services into its consideration of this application. It did not. That criterion is implicit in the third factor enunciated in amended § 209 (b): "the effect which granting the permit would have upon the services of the protesting carriers." This has always been a crucial consideration in contract-carrier proceedings, and nothing in the amendments intimates a change. The fundamental difficulty with the District Court's judgment in this case is that it rests upon a mistaken apprehension that the 1957 amendments had eliminated preference for existing common-carrier service as a permissible determinant of Commission action. Thus it characterized the criteria in § 209 (b) as designed "to insure that their [applicant's and shipper's] interests would receive the same consideration and be weighed in the same balance as those of opposing carriers." 185 F. Supp. 838, 848 (W. D. Mo. 1960). This was a destructive error.

There remain three further grounds on which the District Court invalidated the Commission's order.

(1) The court held that the Commission had imposed on the applicant the precise burden of proof proposed in the rejected language of its bill, that existing carriers were unable or unwilling to provide the transportation service applied for. Had the Commission done this it would have been in clear error. It did not do so.

The trial examiner's findings and recommended order were first reviewed by Division 1 of the Commission. It held in part that "the burden is upon an applicant seeking contract-carrier authority, as well as one seeking common-carrier authority, to establish, among other things, that there is a need for the service proposed which existing carriers cannot or will not meet. . . . A service not needed cannot be found consistent with the public interest or the national transportation policy." 74 M. C. C. 324, 328 (1958). This statement is perfectly consistent with placing the burden of proving its willingness and ability on the protestant, leaving the applicant to go forward with a demonstration of its superior capacity to meet the transportation needs of the shipper.[10] On reconsideration by the full Commission, a statement of like purport was made: "[W]e cannot find that existing service has been shown to be inadequate." 79 M. C. C. 695, 709 (1959).

The court seems to have feared that the Commission was in fact placing a fuller and impermissible burden on applicants, and turned to later Commission dispositions to confirm its suspicions. In *Roy D. Yiengst Common Carrier Application,* 79 M. C. C. 265, 268 (1959), it found a statement that there had been no "showing that the existing carriers are unwilling or unable" to provide the service. But a possibly careless phrase is not conclusive of what the phraser is deciding. If it were, our own opinions might at times be used to bind our hands in later decisions. Had the District Court looked behind

---

[10] The statement may be deemed lacking in detail in not explicitly considering the five criteria in § 209 (b), which became effective in its amended form on August 22, 1957, after the application had been heard but before Division 1's order was issued. See *Ziffrin, Inc.,* v. *United States,* 318 U. S. 73, 78. The final order of the full Commission made the detailed findings, however, so that the question need not detain us.

the words employed in the *Yiengst* decision, *supra,* it would have discovered that they were used as a shorthand description of a more complicated allocation of the burden of proof; for the protestants there had come forward and shown their experience and capacity to handle the traffic, and it was the applicant's subsequent assertion of its superiority that was considered insufficient to overcome this showing. The same thing was true in *Carolina Haulers, Inc., Contract Carrier Application,* 76 M. C. C. 254, 256 (1958), likewise improperly relied on by the District Court.

We should judge a challenged order of the Commission by "the report, read as a whole," *United States* v. *Louisiana,* 290 U. S. 70, 80, and by the record as a whole out of which the report arose. When that is done in this case, it becomes apparent that the Commission did not assign a statutorily impermissible burden of proof to the applicant.

The Commission's final report found from the whole record that the protesting carrier was in fact able and willing to perform the proposed transportation service in the following respects, each of which is set forth explicitly in the report. (1) U. S. A. C., the protestant, is a specialized common carrier in the aircraft field, with approximately 60 percent of its present traffic consisting of fragile parts, like the landing-gear bulkheads whose transportation is needed for Boeing Airplane Company, the shipper. (2) U. S. A. C. is accustomed to modifying its equipment to meet specific needs, and can fashion its services to meet the shipper's production schedules. (3) Specifically, as concerns this traffic, 79 M. C. C., at 708,

> "U. S. A. C. holds the operating authority necessary to furnish the needed service. Its drivers have security clearance; it has equipment suitable for transporting aircraft assemblies, parts, and equipment; and, if the supporting shippers will furnish it

with specifications for the fixtures necessary to handle their particular traffic, it will modify as many pieces of its equipment as is necessary to provide adequate service. Furthermore, it is willing to dedicate certain of its trailers to the exclusive use of each of the shippers."

It is difficult to conceive of more explicit findings, or to quarrel with the Commission's conclusion from them that "U. S. A. C. is in a position to provide any service that is needed . . . ." 79 M. C. C., at 707. The findings, moreover, find ample support in the extensive and detailed testimony of Mr. Decker, in charge of fleet control and operations for U. S. A. C. After the burden of production was placed on the protestant to show in what respects it was capable of handling the disputed traffic, the Commission surely exceeded no statutory prohibition in shifting to the applicant the burden of persuasion of its substantial superiority.

(2) The District Court was persuaded, however, that the Commission had imposed too lenient a burden of production on the protestant, to show merely that "available common-carrier service was reasonably adequate to meet the transportation needs involved." 79 M. C. C., at 701. It concluded that the proper standard was the one enunciated by Congress in amended § 203 (a)(15), of meeting the "distinct need" of each shipper. And it determined that the Commission had not employed that standard: "No consideration was given to the special services which in fact could not be supplied by a common carrier." 185 F. Supp., at 850. A review of the report and the record, judged by the statute's requirements, does not sustain this holding.

In the first place, the Commission made the precise finding required by the court under § 203 (a)(15): "Plainly, there is no warrant on these records for a finding that the supporting shippers require a distinct type

of service that cannot be provided by U. S. A. C. To the contrary, the very business of U. S. A. C. is the transportation of the type of traffic involved." 79 M. C. C., at 709. This finding was itself a conclusion from the detailed enumeration of U. S. A. C. capabilities quoted previously. And there was substantial evidence in the record to support the conclusion that the shipper would be as well served by U. S. A. C. as by the applicant J–T.

The service proposed by J–T was specialized in the following particulars. It had designed a trailer exclusively for Boeing's landing-gear bulkheads at a cost of $3,360 within about two weeks. The trailer was underslung with an adjustable floor and roof in order to permit rear-end loading, a fully enclosed carrier, and the height clearance required by state law on the roads it traveled. The trailer was spotted at Boeing's Wichita plant, available at all times on short notice to leave for the supplier's plant in Indianapolis to pick up another load of bulkheads.

The Traffic Manager for Boeing's Wichita plant testified that the shipper had enjoyed particularly the close coordination with J–T made possible through its near-by Wichita terminal. The bulkheads had to be scheduled into the assembly operation at a predetermined time; constant engineering changes necessitated supply of particular bulkheads for particular planes, and a delay in transportation could prove very expensive. The shipper was disinclined to use U. S. A. C. because it had no Wichita terminal, because its tariffs gave it authority to decide on the type of equipment it would use, and because of an experience of carelessness in 1953, although it was uncertain whether this had been the fault of U. S. A. C. or of the shipper.

U. S. A. C. offered evidence that it maintained a terminal in Indianapolis and one in Topeka, Kansas, which could cover shipments from Wichita. U. S. A. C. would be willing to modify its canvas-topped trailer to install

120

necessary fixtures and a removable or elevatable roof as needed. The roof would take three days to install, the necessary fixtures ten days to two weeks. Its tariff power to control equipment was used only to prevent overloading.[11] It was willing to dedicate the necessary equipment exclusively to the shipper.

From this evidence it was certainly open to the Commission to find, as it did, that U. S. A. C. could meet the "distinct need" of the shipper. The tariff power was no obstacle. An ambiguous and ancient complaint about service need not control. The absence of a Wichita terminal could be offset, if need be, by the presence of an Indianapolis terminal: The traffic had thus far been entirely one way, from Indianapolis to Wichita, and no reason was given why telephonic consultation with Indianapolis, reaching the supplier and the carrier in the same place, might not be as efficient or more so. Moreover, the shipper on three occasions gave evidence that its preference for J–T was in actuality based on a misunderstanding of common-carrier authority that the Commission was under no obligation to credit.[12]

---

[11] The evidence showed that the total weight of the haul was about 5,500 pounds (R. 92), and the trailer proposed by U. S. A. C. had a capacity of 24,000 pounds. (Protestant's exhibit No. 15, R. 147; R. 112.)

[12] J–T's application was supported because ". . . we recognized that the contract carrier can dedicate equipment to our service, the type of equipment that we want, and we feel that on this type of a transportation it is the best thing to have the equipment solely dedicated to our use." (R. 89.)

It did not choose a common carrier "because the common carrier cannot dedicate his equipment exclusively to our service as a contract carrier can." (R. 97.)

Again: "It is my understanding that a common carrier cannot dedicate equipment to a particular shipper, that he holds himself out to furnish that equipment to any shipper that wants it." (R. 103.)

This was of course an erroneous understanding, as Commission precedents demonstrate. A common carrier must hold itself out through

But this does not mean that, as a statutory matter, the Commission was required to find that the protestant could meet the "distinct need" of the shipper. That phrase was inserted in § 203 (a) (15) to restrict the definition of a contract carrier, not to limit the opportunities of a common carrier. It should be noted that a contract carrier may so qualify under that section either by meeting the distinct need of a particular customer or by meeting very ordinary needs through the assignment of vehicles to the shipper's exclusive use. If the latter qualification were controlling in a given case, the consideration of "distinct need" would be irrelevant.

Beyond this parsing of § 203 (a) (15), moreover, there is reason in policy for the Commission to deny an application when the protestant is able to furnish "reasonably adequate" services. The Motor Carrier Act expresses a policy, as we have seen, of preserving existing common carriage against the inroads of contract carriage. One way of putting that policy into effect is to deny a contract-carrier application, as the Commission has always done, unless the applicant can demonstrate that its service will be substantially superior to that afforded by existing carriers. Another way of describing this practice, which the 1957 amendments have in no way affected, is that no permit will issue for traffic that can be handled with reasonable adequacy by a protestant.

(3) The District Court was most emphatic in its conclusion that the Commission had erred in its resolution of the third factor in § 209 (b)—"the effect which granting the permit would have upon the services of the protesting

---

its tariffs to serve any shipper who desires the same class of traffic, but it may specialize as much as a contract carrier does and may dedicate equipment to the use of any one such shipper. When U. S. A. C. offered to do so, it was a reasonable conclusion that the shipper's particular needs had been met.

carriers"—by the aid of an unwarranted presumption. The relevant language of the final report is as follows:

> "The question presented . . . is how we are to determine whether a grant of authority will adversely affect the service of a protestant. It might be argued that where, as here, a protestant is not now enjoying the involved traffic, it cannot be adversely affected by a grant of authority. However, we believe that our past holdings that existing carriers are entitled to transport all the traffic which they can economically and efficiently handle before additional authority is granted are equally valid today as they were prior to the 1957 amendments to the act. There is, in effect, a presumption that the services of existing carriers will be adversely affected by a loss of 'potential' traffic, even if they may not have handled it before." 79 M. C. C., at 705.

How the District Court could be confident that the Commission was blindly applying what it itself called only "in effect" a presumption, in the face of detailed findings that the traffic was one that the protestant "can economically and efficiently handle," it did not explain. Doubtless if the Commission had erected a presumption of adverse effect from evidence simply that the protestant possessed authority in its certificate to carry that traffic, its action would have been inconsistent with congressional deletion of the words "not provided by common carriers" from the amendment to § 203 (a)(15). But, as we have seen, that is plainly not what the Commission did.

The court went further, however, and determined that evidence of the protestant's willingness and ability was by itself insufficient to support the requisite finding of an adverse effect. "Where . . . the protesting carrier is not participating in the traffic involved, there can be no diversion of traffic and hence ordinarily there would be no

adverse effect on the services of the protesting carrier."
185 F. Supp., at 848. It is somewhat difficult to know by
what expert insight the District Court achieved this con-
clusion, at variance with the Commission's deliberate
and considered contrary resolution of the same issue.
Apparently the court thought that the shipper's expressed
preference for the applicant had to be taken into con-
sideration in determining whether the protestant would
be injured by a grant of the permit. Even if this were
a proper reading of the statute, it would not justify
the District Court's conclusion. For the record shows
that when the shipper was asked whose services it would
use if the permit were denied, it replied that it did not
know.

But it is plainly an improper reading of the statute.
The Commission has invariably held that the preference
of a shipper for a particular carrier, even though based on
sound business reasons, is not enough to warrant issuance
of a permit. This practice is unaffected by the 1957
amendments. We have ourselves unanimously held, since
those amendments went into effect, that legally cogni-
zable injury might accrue to an existing carrier denied
potential traffic.

> "[S]urely the statement by General Motors [the
> shipper] that it would not in any event give the
> business to any appellant cannot deprive appellants
> of standing. The interests of these independents
> cannot be placed in the hands of a shipper to do with
> as it sees fit through predictions as to whom its busi-
> ness will or will not go. . . . We conclude, then, that
> appellants had standing to maintain their action to
> set aside the Commission's order under the 'party in
> interest' criterion of § 205 (g) of the Interstate Com-
> merce Act, . . . and under the 'person suffering
> legal wrong . . . or adversely affected or aggrieved'

criterion of § 10 (a) of the Administrative Procedure Act . . . ." *American Trucking Assns.* v. *United States,* 364 U. S. 1, 18.

If a protestant may be "adversely affected" despite shipper hostility for purposes of seeking judicial review, it seems consistent to permit the Commission to find it so for purposes of ruling upon an application under § 209 (b).

There is persuasive legislative history to the same effect. The amendments to S. 1384 proposed in the Senate hearings by the Contract Carrier Conference, which were substantially adopted as the criteria in § 209 (b), would have erected a presumption in favor of a contract-carrier applicant when the shipper had previously been using private carriage. Senate Hearings 305. This provision was supported on the ground that no adverse effect would normally be visited on a protestant when the shipper had so demonstrated its antipathy to common carriage. It was deleted by the Subcommittee. Thus, if we are to place emphasis on congressional rejections, we must take this deletion as significant that shippers' desires are not to be controlling.

But we need not rely on this episode to prove the point. The whole scheme of statutory regulation points the same way. For we must remember that Congress has chosen in the Motor Carrier Act to regulate motor transportation not by the forces of competition but by impartial administration through an expert body. No doubt contract carriage is frequently preferred by shippers for the advantages, chiefly in flexibility of operations, that it may hold over available common carriage. But the national interest to be safeguarded under the National Transportation Policy is entrusted to the I. C. C. and not to the self-interest of shippers. So long as the Commission does not behave arbitrarily, does not reject the offer of relevant testimony or refuse to "consider" some factor that Congress has commanded to be taken into account, the

weight or value accorded the various factors and the Commission's evaluation of the comparative needs of shipper, applicant, and protestant in a particular situation are conclusive.

A careful reading of the report and record demonstrates the unwisdom of overturning the Commission's exercise of its regulatory functions upon merely apparent surface improprieties. For the Commission found as a fact that the protestant needed the proposed traffic; that U. S. A. C.'s

> "ability to obtain business depends on its ability to satisfy the needs of the shippers having transportation requirements similar to those of these supporting shippers, and it is dependent upon the very kind of traffic that is here considered for the continuance of its operations." 79 M. C. C., at 708.

This is the content of the "presumption" that flows from a protestant's showing of its willingness and ability: a decidedly adverse effect from a loss of "potential" traffic. And the finding rested on a substantial array of record facts. U. S. A. C. had demonstrated its needs by actually soliciting Boeing for the traffic, far in advance of this proceeding. Its record of recent "deadheads," or empty trailers, leaving Indianapolis was impressive: in March of 1957, 92 deadheads as against 61 full loads; in April, 85 against 60. A similar empty-equipment problem existed in Wichita. Aircraft-parts transportation in general had recently decreased. The problem was one of aircraft obsolescence, making the business spotty, with recurrent highs and lows. U. S. A. C. had been engaged in the programs for the building of F–184's, B–47's, and B–36's. Each had ended.

Surely it would have been permissible for the Commission, charged as it is with preserving transportation for the national defense, to conclude that the national interest lay in seeking to keep U. S. A. C.'s excess capacity profit-

ably employed and available for future defense needs. The fact that the Commission did not advert expressly to defense needs in its report does not affect the illustration this evidence affords of the way in which a presumption of adversity may reasonably be drawn from evidence of a protestant's desire and capacity for traffic.

## VII.

The appropriate relation between the Commission and the courts was delineated in our treatment of the closely parallel problem in *Secretary of Agriculture* v. *Central Roig Ref. Co.,* 338 U. S. 604. The Sugar Act of 1948, § 205 (a), authorized the Secretary to allocate marketing quotas among particular refineries "in such amounts as to provide a fair, efficient, and equitable distribution" (compare "consistent with the public interest and the national transportation policy"), and directed him to do so "by taking into consideration" three factors— one related to processing of raw sugar from sugar cane, which the Secretary decided was inapplicable, and the other two past marketings and future marketing capacity. The Secretary applied these two by giving them equal weight and referring them to a pre-World War II base period selected as one unaffected by special wartime demands. The resulting allocation order was attacked as exceeding statutory authority and was set aside by the Court of Appeals. This Court reversed, holding that the Secretary had not exceeded the discretion necessarily vested in him by the sugar-quota scheme. We noted that a direction to "consider" certain factors did not control the Secretary's judgment as to what weight should be assigned to each or whether to give weight to all three in each situation. We concluded that so long as the Secretary was not arbitrary in his choice of means to reach an equitable distribution, his decision should stand.

It is a commonplace of administrative law that the evaluation to be given criterial findings, if adequately supported, is left essentially to the administrative agency charged with primary responsibility for interpreting the will of Congress. The extent to which this is so will be misconceived if drawn from abstract conceptions of "fact," "law," or "law-application." For one thing, the permissible scope of administrative discretion may vary from section to section within a single statute. For another, the task of exercising an informed discretion in administrative proceedings extends from testimonial submissions through considerations of regulatory policy to obedience of a statutory command. It is a question of policy, derived from due regard for, and based on understanding of, the regulatory scheme enacted by Congress, at which point a reviewing court should intervene. A conclusion that the agency's determination, resting on findings (where, as is normally true, they are required) appropriately supported by evidence, is within its power to make is a conclusion that the factors calling for intervention are absent. Compare *Interstate Commerce Commission* v. *Union Pacific R. Co.,* 222 U. S. 541, 547–548.

Administrative agencies are not only vested with discretion in sifting evidence and in making findings but may also draw on their specialized competence for ascertaining the reach and meaning of statutory language. Compare *Social Security Board* v. *Nierotko,* 327 U. S. 358, 368–371, with *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 128–131. The factors to be considered on judicial review of such an administrative determination include the precision of the statutory language, the technical complexity of the relevant issues, the need for certainty as against experimentation, and the likelihood that Congress foresaw the precise question at issue and desired to express a foreclosing judgment on it. In assessing these factors, we are guided primarily by an investigation

of the prior law as it sheds light on the "mischief" Congress sought to alleviate, and of the statute itself to see how closely Congress sought to define the balance of competing considerations it addressed.

That investigation here reveals that Congress conferred the power on the Commission to decide as it has done in this case. None of the precedents is to the contrary; each points to this conclusion. See *United States* v. *Pierce Auto Lines,* 327 U. S. 515, 535–536 (not for courts to gauge public interest; so long as requisite findings are made and supported by evidence, the resolution of relevant factors is for the Commission); *Bass* v. *United States,* 163 F. Supp. 1, 4 (W. D. Va. 1958), aff'd *per curiam,* 358 U. S. 333 (same); cf. *United States* v. *Detroit & Cleveland Nav. Co.,* 326 U. S. 236, 240–241. In *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83, 86 n. 3, 90, the Court deliberately refrained from guiding the Commission's discretion in evaluating the relative advantages of competing carriers.[13]

---

[13] Nor is the holding in the *Schaffer* case of any aid to the appellees. The Court held that a common-carrier applicant could not be denied a certificate on the grounds of existing rail service, without a finding whether the "inherent advantages" of motor transport should warrant the grant. Such a finding was thought necessary to conform to the dictates of the National Transportation Policy, the Court declaring that:

"To reject a motor carrier's application on the bare conclusion that existing rail service can move the available traffic, without regard to the inherent advantages of the proposed service, would give one mode of transportation unwarranted protection from competition from others." 355 U. S., at 90–91.

On 91–92, the Court recognized that these considerations did not necessarily pertain to applications opposed by other motor carriers. The Commission has held in these proceedings that motor common and contract carriers are not different "modes" of transportation, 79 M. C. C., at 710, and its expert conclusion is entitled to great weight. Indeed, the whole history of motor carrier regulation negates any suggestion that Congress has been interested in preserving competition between the different classes of motor carriers.

Determinations by the Commission which Congress has committed to its judgment must be judicially respected because such exercises of administrative discretion are beyond the competence or jurisdiction of courts. Their power of review is confined to correction of Commission action that transcends the authority given it by Congress, including of course disregard by the Commission of procedural proprieties resulting in arbitrary use of its powers.

In the present case, no claim can be made that the Commission's findings are unsupported by substantial evidence. *United States* v. *Pan American Corp.*, 304 U. S. 156, 158; cf. *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474; see Administrative Procedure Act, § 10 (e), 60 Stat. 237, 243 (1946), 5 U. S. C. § 1009 (e). The Commission's detailed report negatives this, as it would a claim that the Commission neglected to make requisite findings.

Of course the provisions of the National Transportation Policy must be applied by the Commission to each application, see *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83, 88, but they "represent, at best, a compromise between stability and flexibility of industry conditions, each alleged to be in the national interest, and we can only look to see if the Commission has applied its familiarity with transportation problems to these conflicting considerations." *American Trucking Assns.* v. *United States,* 344 U. S. 298, 314; see *Interstate Commerce Commission* v. *Parker,* 326 U. S. 60, 66. The Commission's action here certainly does not fall short of that standard. See 79 M. C. C., at 705–706.

An order of the Commission cannot stand, it is true, if we cannot tell what has been decided or if it leaves unclear the basis for its conclusions. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 510–511. Findings are no doubt judicially more persuasive the more felicitously they are formulated and the less they require

extraction from a diffuse report. But the Commission is not under statutory duty to set forth its findings in serried array. It is the Court's duty to sustain the Commission's findings if, as here, there is no real difficulty in determining what was decided and on what grounds.

It is not the Court's function to impose our standards of lucidity or elegance in exposition upon the Commission. And we should take due warning from the consequences of our decision in *City of Yonkers* v. *United States,* 320 U. S. 685, of what may follow from exacting overnice requirements of the I. C. C. There the Commission had made no explicit finding that an electric interurban railway was an integral part of a steam railroad system as it had to be before the Commission could allow it to suspend its operations. The facts were so clearly spread upon the record that the point was not argued until one of the parties raised it on appeal. This Court remanded the case for an express finding. The Commission took some more evidence and in due course it entered the inevitable finding. The order was attacked again in the District Court, affirmed again after another lengthy opinion, and eventually affirmed *per curiam,* 323 U. S. 675. That wasteful charade ought not to be repeated here.

I would reverse and allow the Commission's order to stand.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, concurring in part.*

These are appeals from the judgment of a District Court setting aside an order of the Interstate Commerce Commission denying an application for a contract-carrier permit. The application sought authority to transport canned goods under continuing contracts with three

---

*[This opinion applies only to No. 49, *Atchison, Topeka & Santa Fe R. Co.* v. *Reddish,* No. 53, *Interstate Commerce Commission* v. *Reddish,* and No. 54, *Arkansas-Best Freight System, Inc.,* v. *Reddish.*]

Arkansas canning companies to points in 33 States and to return from those points with canned goods and canning materials such as cans, lids, and corrugated boxes. It was opposed by two groups of railroads, one motor contract carrier and 25 motor common carriers, authorized to undertake transportation in the territory proposed.

The trial examiner's recitation of facts, as adopted by the Commission, may be briefly summarized. Each of the supporting shippers does a substantial volume of business with small-lot purchasers. These customers maintain low inventories, necessitating a transportation service capable of effecting multiple pickups and deliveries on short notice. Each shipper has engaged in private carriage for this purpose, sending only single-lot full truckloads by common carrier. The Steele Canning Company's private equipment was furnished in part through a lease of the applicant's trucks. When a strike of its drivers occurred, it sought to contract with the applicant for its independent services. The other shippers, who before the strike sold much of their goods through Steele, now wish to expand their sales to individual customers and desire the same type of service from the applicant.

Under its temporary authority, the applicant has been offering several stops in transit at the truckload rate, and assessing no stop-in-transit charge, thus rendering in effect a less-than-truckload service at truckload rates.

Existing motor carriers possess the authority and equipment to provide service to a substantial number of the points involved, either directly or by joint-line operations. Although few have previously participated in this particular transportation, each displays a desire to obtain the traffic; so do the protesting railroads, which have recently experienced a sharp decline in canned-goods tonnage. The motor carriers are willing and able to provide multiple pickups and deliveries where authorized.

The shippers asserted a preference for the applicant's services on two specific grounds. First, they contended that existing carriers were unable to furnish multiple pickup and delivery service with sufficient expedition. Second, they maintained that the less-than-truckload rates charged by common carriers were prohibitive in light of the small profit from a canned-goods shipment allowed by competitive conditions. Accordingly, they asserted that, if the permit were denied, they would resort to private carriage.

On the first point, the Commission concluded that the type of service required by the shippers was not substantially different from that offered by available motor common carriers. Its treatment of the third and fourth criteria in § 209 (b) of Part II of the Interstate Commerce Act, added by 71 Stat. 411 (1957), 49 U. S. C. § 309 (b), a treatment attacked and invalidated in the District Court, was animated by the same policy preference for preserving available common carriage that characterized its disposition of the *J–T Transport* application, reviewed here today, *ante,* p. 81. The pertinent portion of its report is as follows:

> "Aside from evidence pertaining to rates, the record is devoid of any substantial showing of dissatisfaction on the part of the shippers with existing service. Complaints about joint-line service, slow transit time, and inability to arrange multiple pickups and deliveries are of a general nature, and are not substantiated by reference to specific instances. Although protestant motor carriers, especially those operating over regular routes, may be hindered in some instances by their authorities and the nature of their operations from achieving complete flexibility in effecting multiple pickups and deliveries, the supporting shippers have failed to show that they have been unable to obtain reasonably adequate service

upon request. . . . In the absence of a more positive showing that existing service will not meet shipper's reasonable transportation needs, we are not warranted in finding that a new service should be authorized or that the supporting shippers will be adversely affected by a denial of this application." 81 M. C. C. 35, 41–42 (1959).

This conclusion was attacked and set aside in the District Court on much the same grounds as those leading to a similar result in the *J–T Transport* case, *supra*. Little need be added here to what I said there. Suffice it to say that the Commission made the findings required of it by § 209 (b) and that each was supported by substantial evidence. Although its evaluation of those findings and the conclusion that it drew from them [1] may be different from those we might have reached were we on the Commission, it is not for a reviewing court to upset the Commission's informed judgment on the factors it has been asked by Congress to consider. *United States* v. *Pierce Auto Lines,* 327 U. S. 515, 535–536; *Bass* v. *United States,* 163 F. Supp. 1, 4 (W. D. Va. 1958), aff'd *per curiam,* 358 U. S. 333; and see *Secretary of Agriculture* v. *Central Roig Ref. Co.,* 338 U. S. 604.

There is, however, an additional issue in this case that differentiates it from *J–T Transport, supra.* It is whether the Commission is required in an application proceeding to consider evidence that the rates of available common carriers are so high as to make transportation costs prohibitive for a supporting shipper.

Before reaching that issue, it is necessary to dispose of a contention that prevailed in the District Court and is pressed here, that the Commission must consider in every

---

[1] The Commission has consistently ruled that a joint-line transportation service is not inadequate to meet a shipper's needs. See cases collected in Hale & Hale, Competition or Control III: Motor Carriers, 108 U. Pa. L. Rev. 775, 783 n. 24 (1960).

application evidence of mere rate advantages resulting from economies inherent in contract-carrier operations. Section 209 (b) makes no such requirement.

In *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83, 91–92, we recognized and impliedly approved the long-standing Commission practice of ignoring rate advantages offered by an applicant over available motor carriers. The Commission has consistently ruled that a shipper dissatisfied with existing common-carrier rates cannot on that ground alone successfully support an application for a contract-carrier permit, and that its remedy lies in attacking the rates under § 216 of the Act. See, *e. g., Dixon & Koster Contract Carrier Application,* 32 M. C. C. 1, 4 (1942); *James F. Black Extension of Operations—Prefabricated Houses,* 48 M. C. C. 695, 708–709 (1948); *Joseph Pomprowitz Extension—Packing House Products,* 51 M. C. C. 343, 350 (1950). That is what it ruled in this case, see 81 M. C. C., at 42–43.

This consistent Commission practice rests on relevant transportation policy considerations. If rate advantages resulting from inherent economies were made a determining factor, the Commission would have to permit protestants to challenge the cost justification of an applicant's proposed rates. This the Commission has never permitted, see *Omaha & C. B. R. & Bridge Co. Common Carrier Application,* 52 M. C. C. 207, 234–235 (1950), largely because at the application stage there is as yet no revealing record of profit or loss derived from the proposed transportation service,[2] and its refusal has been judicially approved. *Railway Express Agency* v. *United States,* 153 F. Supp. 738, 741 (S. D. N. Y. 1957), aff'd *per curiam,* 355 U. S. 270; see *American Trucking Assns.* v. *United States,* 326 U. S. 77, 86–87.

---

[2] Thus in the present case the applicant submitted a balance sheet but no income statement (R. 31).

More fundamentally, it misconceives the object of congressional motor-carrier regulation to maintain that the Commission must in application proceedings respect inherent cost advantages of contract as against common carriers. They are not different "modes" of transportation within the meaning of the National Transportation Policy, and Congress has not been concerned with maintaining competition between them as it has been, for example, between railroad and motor carriers. Compare *Schaffer Transp. Co.* v. *United States,* 355 U. S. 83. The Commission is specifically admonished, in § 218 (b) of the Act, not to prescribe minimum rates that give contract carriers an undue competitive advantage over common carriers.

In rate proceedings, however, the Commission has construed this section as not authorizing it to invalidate cost-justified rates of existing, previously authorized contract carriers even though they may draw away a large volume of traffic from common carriers. *New England Motor Rate Bureau* v. *Lewers,* 30 M. C. C. 651 (1941). Once granted a permit, therefore, a contract carrier may exploit its inherent cost advantages to the great detriment of existing common carriers. In determining to ignore those cost advantages in an application proceeding, the Commission acts well within its authority to effectuate the congressional policy of limiting entrance to contract carriage as a means of preserving the capacity of available common carriers to meet the Nation's transportation needs.

That policy is unaffected by the 1957 amendments to §§ 203 (a)(15) and 209 (b). There is not one reference to rates in the legislative history of those amendments. If anything, the action of the 1957 Congress looks the other way; § 218 (a) was amended, by 71 Stat. 343, 49 U. S. C. § 318 (a), to require the filing of actual rather

than minimum contract-carrier rates, so as to eliminate a competitive disadvantage of common carriers.

The right of the Commission to disregard rate advantages as such in application proceedings does not, however, dispose of this case. For the testimony and arguments presented to the Commission fairly raised the claim that the available common carrier rates, whether or not just and reasonable in relation to transportation costs, were prohibitive for the shippers. If this claim were sustained by the Commission, it is difficult to see how it could avoid the conclusion that a denial of the permit would hobble the shipper without benefiting protestants by potentially augmenting their traffic.

The Commission has in fact recognized what it styles an "embargo" exception to its usual practice of disregarding the level of rates charged by existing carriers. See *H. L. & F. McBride Extension—Ohio,* 62 M. C. C. 779, 790 (1954). In *Herman R. Ewell Extension—Philadelphia,* 72 M. C. C. 645, 648 (1957), the Commission treated a shipper's claim similar to the present one in a manner relevant to our problem.

> "[T]he present record does not show any effort by the carriers to handle with the shipper its claim that their rates are prohibitive. Sugar is a relatively inexpensive commodity which sells at prices which, compared to prewar prices, do not appear to have increased percentagewise to the same extent as most other commodities. It appears not improbable that the margin of profit thereon is so narrow that the traffic will not move except at rates lower than other commodities customarily moved in tank-truck equipment. It may be that protestant's rates, though not intrinsically unreasonable from a standpoint of cost or compared to other bulk liquid rates, are still too high to move this particular traffic. And it may be that protestants are within their rights in the exer-

cise of their managerial discretion in refusing any reduction even at the cost of losing the traffic but, if so, they should at least have negotiated with the shippers to the point of making their positions clear. Their failure to do so indicates either decision to forego the traffic except at their present rates or a lack of interest in it at rates at which it can move.

"Without departing from the general proposition that the reasonableness of rates is not an issue in public convenience and necessity proceedings, and that if rates are too high an adequate remedy is available under section 216 of the Interstate Commerce Act, we conclude that authority should be granted here. . . . [Protestants'] rates have not and will not move the traffic; and to this extent the available motor service is inadequate to meet the shipper's requirements. Protestants, never having handled the traffic, will not be adversely affected by this action."

In the *Ewell* proceeding, there was evidence that the existing rates were two to three times as high as those proposed by the applicant, that the shipper would have to "absorb" about $200 on each 30,000-pound shipment, and that it had asked existing carriers to adjust their rates without result. Similar evidence was presented in the present proceeding. The representative of the Steele Canning Company testified that, in numerous discussions with protestant carriers, it had learned that their less-than-truckload rates were two and three times as high as the truckload rates proposed by the applicant, and that these rates would drive its canned goods out of the competitive market. Whether this testimony was specific and persuasive enough to establish that the traffic would not move at existing rates we do not know, for the Commission made no finding on this issue. Compare *Schirmer Transp. Co., Inc., Extension—Molasses*, 77 M. C. C. 240,

242 (1958). Until it does, we are unable to exercise our reviewing function of ensuring that the Commission stays within its statutory authority and does not act arbitrarily. Cf. *Florida* v. *United States,* 282 U. S. 194, 214–215.

I would vacate the judgment of the District Court and remand the case to the Commission for a considered determination whether the rates of protestant motor carriers are prohibitive. The scope of inquiry should be strictly limited. The Commission need not engage in a full-dress rate proceeding to determine whether present motor-carrier rates are unjust or unreasonable. It need only find, from the evidence of record or additional evidence that it deems necessary, whether those rates impose an embargo on the shippers' goods.