323 F.2d 777
 ALEXANDRIA, BARCROFT AND WASHINGTON TRANSIT COMPANY, a corporation, and D. C. Transit System, Inc., a corporation, Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
Washington, Virginia and Maryland Coach Company, Inc., Intervenor.
 No. 8933.
 United States Court of Appeals Fourth Circuit.
 Argued June 12, 1963.
 Decided September 23, 1963.
 
 S. Harrison Kahn and Harold Smith, Washington, D. C. (E. Waller Dudley, and Boothe, Dudley, Koontz & Boothe, Alexandria, Va., on brief), for petitioners.
 Manuel J. Davis, Washington, D. C., on brief for intervenor.
 Russell W. Cunningham, Arlington, Va., for respondent.
 Before BRYAN and J. SPENCER BELL, Circuit Judges, and WINTER, District Judge.
 J. SPENCER BELL, Circuit Judge.
 
 
 1
 Petitioners seek review of an order of the Washington Metropolitan Area Transit Commission which granted a certificate of public convenience and necessity. The certificate, issued to Vernoy Franklin on November 1, 1962, by Order Number 213[1], permits the transportation of charter parties of charitable and public supported groups in school bus type vehicles from certain portions of the Washington, D.C., metropolitan area to other portions of that area.
 
 
 2
 The Washington Metropolitan Area Transit Commission (hereinafter called the Transit Commission) was created under the terms of a transit regulation compact entered into by the States of Maryland and Virginia and by the District of Columbia. Jurisdiction to review orders of the Transit Commission has been conferred jointly upon the United States Court of Appeals for the Fourth Circuit and for the District of Columbia Circuit. Washington Metropolitan Transit Regulation Compact Act (1960), § 6, and Title II, Article XII, § 17(a), Public Law 86-794, 74 Stat. 1031.
 
 
 3
 Prior to the execution of the Compact, authority to regulate mass transit service in the Washington Metropolitan Area had been divided among Virginia, Maryland, the District of Columbia, and the Interstate Commerce Commission. In 1955, Congress authorized funds for a study of the transit problems of the area, Public Law 84-24, 69 Stat. 41 (1955), and additional funds were later authorized. Public Law 84-573, 70 Stat. 257 (1956). One of the steps taken by Congress as a result of this study was the authorization of negotiations between the District of Columbia, Maryland and Virginia, of the terms of a Washington metropolitan area mass transit compact. National Capital Transportation Act of 1960, Title III, § 301, 40 U.S.C.A. § 671. As the possibility of such a compact had been long under consideration, negotiations proceeded apace, and before the end of 1960 Congress was able to give consent and approval to its terms. Washington Metropolitan Area Transit Regulation Compact Act, Public Law 86-794, 74 Stat. 1031 (1960), amended, Public Law 87-767, 76 Stat. 764 (1962). The Transit Commission officially began operations on March 22, 1961.
 
 
 4
 Accompanying the National Capital Transportation Act of 1960 was the report of the House Committee on the District of Columbia, U.S.Code Cong. & Adm. News, 86th Cong., 2d Sess., 1960, P. 3212. This report makes it clear that one of the main problems sought to be alleviated by the approval of a mass transit compact was the area's steadily worsening traffic congestion caused by the rapidly increasing use of private automobiles on the highways of the metropolitan area, a problem of concern in many areas of the country today. Mentioned as possible solutions to the problem were an increase in the use of mass transit facilities, such as buses, and the construction of an extensive subway system.
 
 
 5
 The creation of the Transit Commission was one of the steps taken by Congress in the realization that regulation of mass transit in a large metropolitan area requires solutions specifically tailored to the area's special needs. It is, therefore, to be reasonably expected that the Transit Commission, in the exercise of its administrative functions, may establish regulations and a body of case by case decisions that will differ from those of public bodies regulating transportation. For example, it cannot be expected that the Transit Commission will necessarily determine the requirements of "public convenience and necessity" in relation to mass transit in the Washington metropolitan area to be the same as would either the Interstate Commerce Commission or the local commissions previously involved in regulating various aspects of this traffic. The impact of rules and decision of such public bodies as "stare decisis" for the present Transit Commission is, therefore, limited. These decisions, and those of reviewing courts, may aid in the search for the meaning of a statutory phrase and, perhaps, help point up the outer limits of administrative discretion; but they cannot generally be used to show the path the Transit Commission must follow in determining the requirements of the public convenience and necessity.
 
 
 6
 That this is so is made apparent by Title II, Article XII, § 21, of the Compact which makes prior decisions of the Interstate Commerce Commission and the local commissions effective and enforceable only until the Transit Commission provides otherwise. Clearly this implies the right of the Transit Commission to establish, within statutory limitations, new rules based on its own conception of the needs of mass transit of persons in this highly populated area.
 
 
 7
 With this background in mind we can turn to the facts of the instant proceeding in an effort to determine whether the Transit Commission has exceeded or erroneously applied its statutory authority. These facts are relatively uncomplicated.
 
 
 8
 Protestants, the Alexandria, Barcroft and Washington Transit Company, the D. C. Transit System, Inc., and the Washington, Virginia, and Maryland Coach Company, Inc., possess Certificates of Convenience and Necessity granting them the right to operate regular bus lines and charter bus service in the Washington metropolitan area. They are incontestably ready, willing and able to perform the charter service involved here, and have sufficient equipment and personnel to do so. However, due to the expensive nature of both their equipment and the type of service they perform, the rates that they must charge in order to remain profitable are so high as to be generally beyond the effective reach of such charitable or public supported organizations as the Little Leagues, the Girl Scouts, and the Young Men's Christian Associations. The evidence indicates that heretofore, when these groups required transit, they would generally arrange for auto pools rather than make use of the expensive services of the protestants. The further indication was that these groups would use bus service if the cost of transportation could be brought within the reach of their pocketbooks. The applicant, Vernoy Franklin, seeks to fill this need. His operation, involving the use of school bus type vehicles rather than the more expensive type equipment used by the protestants, and exclusively limited to charter operations, is apparently sufficiently inexpensive to meet the needs of these groups. On this limited basis the Transit Commission granted the Franklin application. The Transit Commission recognized that the protestants have the necessary equipment, personnel and facilities, but that their rates must be set so high as effectively to make them unable to perform the service. As the public supported and charitable groups have not in the past made other than minor use of the protestants' services, and indications were that this state of events would continue in the future, it was found that the grant of authority to Franklin would not entice an appreciable number of customers away from the protestants. Thus the probable adverse competitive effects on protestants of the grant of the certificate were found to be minor. The Transit Commission, therefore, found that the public convenience and necessity required the grant of the certificate, as limited, to Franklin. After the Transit Commission denied reconsideration of the order, this petition for review was filed.
 
 
 9
 Our scope of review of the Transit Commission's findings of fact is limited to determining whether they are supported by substantial evidence. Compact, Title II, Article XII, § 17(a). The Compact leaves to the Transit Commission the determination of the requirements of public convenience and necessity, and we may intervene only if the administrative discretion of the Commission has been abused. Compact, Title II, Article XII, § 4(b). Cf. United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962); Interstate Commerce Commission v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945); National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).
 
 
 10
 It is in light of these standards of review, and in light of the purposes of Congress and the compacting parties, that we must consider the Transit Commission's decision. As we find the order to be supported by substantial evidence and within the range of administrative discretion, we affirm.
 
 
 11
 Title II, Article XII, § 4(e) of the Compact provides that "no certificate shall be issued to operate over the routes of any holder of a certificate until it shall be proved to the satisfaction of the Commission, after hearing, upon reasonable notice, that the service rendered by such certificate holder, over such route, is inadequate to the requirements of the public necessity and convenience * * *." The protestants assert that the proof clearly shows their service to be more than adequate for the requirements of the public necessity and convenience. They claim that the sole basis for the issuance of the certificate to Franklin was the difference in rates between those of the protestants and those proposed by Franklin. They then cite Interstate Commerce Commission decisions to the effect that rates will not be taken into account in deciding certification cases. However, as we have indicated, these decisions are not binding on the Transit Commission. We must decide not whether the decision under review comports with that which a different commission would have reached, or whether such different commission would have given greater or lesser weight to the factors relied on by the Transit Commission. Rather, we must determine whether the Transit Commission has improperly taken into account certain factors, or failed to take into account other factors, in abuse of its discretion under the terms of the Compact.
 
 
 12
 However, in light of the facts of the instant proceeding, we need not reach the issue of the effect that may be given, in a certification proceeding, to a mere difference in rates, for the evidence clearly indicates that the rates charged by the protestants are so high as to make the service proposed by the applicant a completely different one. In Interstate Commerce Commission v. J-T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), the Supreme Court was construing a statute that required the Interstate Commerce Commission, in determining whether to grant a new certificate, to take into account the needs of shippers. The Court held that under the terms of the statute, rates would, under certain conditions, have to be taken into account. The Court stated that:
 
 
 13
 "It would seem hardly contestable that if denial of the application meant, for example, that a shipper's costs of transportation would be prohibitive, the shipper had established a `need' for the more `economical' service. * * * This does not mean that the lawfulness of rates would be injected into certificate proceedings. The issue of whether or not the proposed service offers a rate advantage and if so whether such advantage establishes a `need' for the service that overrides counterbalancing considerations presents issues that fall far short of a rate proceeding." 368 U. S. at 92, 82 S.Ct. at 211, 7 L.Ed.2d 147.
 
 
 14
 Even the dissenting Judges concurred in the conclusion that the Interstate Commerce Commission must take rates into account where:
 
 
 15
 `[A] denial of the permit would hobble the shipper without benefiting the protestants by potentially augmenting their traffic." 368 U.S. at 136, 82 S.Ct. at 215, (opinion of Frankfurter, J., concurring in part).
 
 
 16
 Interstate Commerce Commission v. J-T Transport Co. establishes the principle that in the field of transportation rates may be taken into account in a certification proceeding in determining the needs of shippers where the shipper is priced out of the protestant's services. We can find no reversible error in the transit Commission taking this "need" into account in determining the requirements of public convenience and necessity[2].
 
 
 17
 The Transit Commission's findings are supported by substantial evidence. Several persons testified that many public supported and charitable groups do not either use or intend to use protestants' services because of their high costs. Witnesses testifying to this effect had experience with Y.M.C.A., Girl Scout, and Little League groups. Testimony pointed out by protestants shows merely that they have the equipment, facilities, and personnel for transporting these groups. Protestants' testimony did not show that they were willing to transport these groups at the low prices necessary. Although some of the witnesses had not fully investigated the possibility of using the protestants' services, at least one of them had done so, and found the cost prohibitive. The testimony was clear that none of the groups with which the witnesses were involved used or would use the protestants' services to any appreciable extent. This testimony supports the Transit Commission's conclusion.
 
 
 18
 The protestants assert that the limitations placed on the grant of authority to Franklin are in excess of the Transit Commission's authority. They point specifically to Title II, Article XII, § 4(b) of the Compact, which provides that:
 
 
 19
 "The Commission shall have the power to attach to the issuance of a certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require; provided, however, that no terms, conditions, or limitations shall restrict the right of the carrier to add to his or its equipment and facilities * * * as the development of the business and the demands of the public shall require."
 
 
 20
 The restrictions placed on the instant certificate by the Transit Commission are of the type of vehicles usable and service performable rather than against additions to equipment. This is not violative of the statutory prohibition. Cf. Crescent Express Lines v. United States, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127 (1943); Noble v. United States, 319 U.S. 88, 63 S.Ct. 950, 87 L.Ed. 1277 (1943). As the Transit Commission properly found these limitations to be required by the public convenience and necessity, and they do not contravene the prohibition against limitations preventing additions, the restrictions are not illegal.
 
 
 21
 The terms "school-bus type vehicles" and "charitable and public supported groups" are not, as the protestants contend, so vague as to defy interpretation. Should difficulty arise in determining the outer limits of these phrases, the Transit Commission has ample authority to clarify them further. See Title II, Article XII, §§ 4(g), 13, and 15 of the Compact.
 
 
 22
 For the reasons stated above, the order of the Transit Commission under review is
 
 
 23
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The relevant provisions of the order state:
 "1. That Certificate of Public Convenience and Necessity No. 6 be, and it is hereby, granted to Vernoy Franklin to transport passengers for hire as follows:
 "IRREGULAR ROUTE CHARTER OPERATION:
 "Charitable and public supported groups, including but not limited to, public, parochial and private schools, churches, Boy and Girl Scouts, and similar groups in charter operations, in interstate commerce.
 "From points and places in Arlington and Fairfax Counties, and the cities of Alexandria, Falls Church and Fairfax, Virginia, to points and places in the District of Columbia and in the counties of Montgomery and Prince George, Maryland and return.
 "Restricted to the performance of such transportation in school bus type vehicles only. And further restricted that this grant of authority shall not be subject to transfer in any manner or form."
 
 
 [2]
 In light of our basis for affirming the order, we do not reach the Transit Commission's contention that the limiting provision of Title II, Article XII, § 4(e), of the Compact does not apply where irregular route carriers are involved