**CONTINENTAL CONTRACT CARRIER CORPORATION, Plaintiff,**

and

**Roberts Consolidated Industries, Inc., Intervening Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Ringsby Truck Lines, Inc., et al., Intervening Defendants.**

**Civ. No. 68–919.**

United States District Court,
C. D. California.
March 18, 1970.

Arthur H. Glanz and William F. Clements, Los Angeles, Cal., Nelson, Harding, Leonard & Tate, J. Max Harding and Charles J. Kimball, Lincoln, Neb., for plaintiff.

Gibson, Dunn & Crutcher, Herbert Kraus and Robert E. Cooper, Los Angeles, Cal., Stern, Harris, Feldman & Becker, Donald L. Stern, Omaha, Neb., for intervening plaintiff.

Edwin M. Zimmerman, Asst. Atty. Gen., John H. D. Wigger, Atty., Department of Justice, Washington, D. C., William Matthew Byrne, Jr., U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civil Division, Carolyn M. Reynolds, Asst. U. S. Atty., for defendant United States of America.

Robert W. Ginnane, Gen. Counsel, John E. Faulk, Attorney Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

Berol, Loughran & Geernaert, Edward J. Hegarty, San Francisco, Cal., for intervening defendants Ringsby Truck Lines, Inc., Ringsby-Pacific Ltd., Garrett Freight Lines, Inc., Pacific Intermountain Express, IML Freight, Inc.

Rice, Carpenter & Carraway, Roland Rice, Richard R. Sigmon, Washington, D. C., Russell & Schureman, Los Angeles, Cal., for intervening defendant Regular Route Common Carrier Conference of American Trucking Ass'ns, Inc.

Axelrod, Goodman & Steiner, Arnold L. Burke, Chicago, Ill., Russell & Schureman, R. Y. Schureman, Los Angeles, Cal., for intervening defendants DC International, Inc. and Illinois-California Express, Inc.

Russell & Schureman, Los Angeles, Cal., for intervening defendants Braswell Motor Freight Lines, Inc., Transcon Lines, Watson-Wilson Transportation System, Inc., Western Gillette, Inc.

Reeder, Griffin, Dysart & Taylor, Kansas City, Mo., for intervening defendant Transcon Lines.

John M. Records, Kansas City, Mo., for intervening defendant Watson-Wilson Transportation System, Inc.

## MEMORANDUM OF DECISION AND ORDER

Before BARNES, Circuit Judge, and GRAY and REAL, District Judges.

WILLIAM P. GRAY, District Judge.

The plaintiff, Continental Contract Carrier Corporation (Continental), filed an action under 28 U.S.C. § 1336 to set aside a decision and order of the Interstate Commerce Commission, which denied it permanent authority to operate as a contract carrier for Roberts Consolidated Industries, Inc. (Roberts or shipper).

Roberts intervened in this action on behalf of the plaintiff. The Commission is supported by the Regular Common Carrier Conference of the American Trucking Associations, Inc. and eleven other motor common carriers. All of them intervened before the Commission, and in this action, in opposition to the authority sought by the plaintiff.

By an application filed on May 27, 1965, the plaintiff sought a permit to operate as a contract carrier of upholstery and carpet tacking rims, strips and nails, adhesive cement, iron and steel doors, and hardware therefor, mechanic hand tools, advertising materials, and racks and stands therefor, over irregular routes from various specified points in California, Washington, Oregon and Ohio to other points in continental United States, except Maine, Vermont and New Hampshire, under a continuing contract with Roberts.

The hearing examiner for the ICC found that the issuance of a permit for the proposed operation would change the status of the applicant from a contract carrier to a common carrier, because the applicant would then be serving more than a limited number of shippers and would not qualify as a contract carrier as defined in section 203(a) (15) of the Motor Carrier Act. (49 U.S.C. § 303(a) (15)).[1] Exceptions were filed by the plaintiff and by the Contract Carrier Conference.

On December 19, 1967, the Commission issued a report and order in which it rejected the finding of the hearing examiner that the plaintiff's operations constituted common carriage, and held

[1] "(15) The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation * * * under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

that if the authority sought were granted, Continental would not lose its status as a contract carrier. However, the Commission denied the application for permanent authority on the ground that Continental had failed to establish that the proposed operation would be consistent with the public interest and the national transportation policy.[2] The plaintiff filed a petition for reconsideration, which was denied, and this action followed.

An applicant who initially qualifies under the definition of a contract carrier in section 203(a) (15) of the Motor Carrier Act (49 U.S.C. § 303(a) (15)) must follow the procedures outlined in section 209(b) (49 U.S.C. § 309(b)) in order to secure a permit. As provided in the last mentioned section, he must show:

> "That the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the national transportation policy declared in this Act; otherwise such applications shall be denied. In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider [1] the number of shippers to be served by the applicant, [2] the nature of the service proposed, [3] the effect which granting the permit would have upon the services of the protesting carriers [4] and the effect which denying the permit would have upon the applicant and/or its shipper and

> ▮ the changing nature of that shipper's requirements."

The Commission ruled that Continental did not satisfy the requirements of any of the five criteria which the above-quoted statute directs the ICC to consider. We have concluded that we must reverse, and we now discuss the principal reasons given by the Commission for its findings with respect to each of the five criteria and indicate why we are unable to agree therewith.

## I. THE NUMBER OF SHIPPERS TO BE SERVED BY THE APPLICANT.

The standard consistently used by the Commission in applying this criterion is set forth in William P. Bursch, 91 M.C.C. 953, 956 (1963):

> "If the number of shippers *already* served approaches the maximum number permitted, the applicant, even though qualifying as a contract carrier, cannot be considered to have made any significant showing under this test." (Emphasis added.)

While no number has been fixed as an absolute maximum, the Commission frequently has held that it lies somewhere between six and eight. *See* Umthun Trucking Co., 91 M.C.C. 691, 697 (1962).

▮ It is apparent from its opinion in the present case that the Commission, in considering the number of shippers to be served, took into account both previously granted and still pending applications relating to other shippers. The Commission should not have done so. Although the language "to be served" could reasonably be interpreted to include all applications with respect to whether a carrier still fit within the definition of a contract carrier in section 203(a) (15) (*i. e.,* serving "a limited number of shippers"), it would seem inappropriate so to interpret such language in the context of section 209 (b), as that section is concerned with whether or not a *particular* operation for a single shipper is consistent with the public interest. *See* Umthun Trucking Co., 91 M.C.C. 691, 693 (1962). That other applications may be pending is not relevant to the issue of whether a *particular* service is consistent with the public interest. Moreover, the ICC has authority to deny later applications, either on the section 203(a) (15) grounds or on the section 209(b) grounds.

2. Continental Contract Carrier Corporation, 106 M.C.C. 277 (1967).

If the current application were to be granted, Continental would be serving four shippers. While it is difficult to say how much weight was or should be given to this first criterion, it may be noted that in an earlier case, Nationwide Carriers, Inc., 92 M.C.C. 1 (1963), the ICC granted a permit to a contract carrier that served the identical number of shippers involved here. This court therefore finds that there is no substantial evidence in the record to uphold the finding of the Commission on this point.

## II. THE NATURE OF THE SERVICE PROPOSED.

In I. C. C. v. J-T Transport Co., 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961), the Supreme Court outlined how the burdens of proof were to be allocated with respect to this criterion. Justice Douglas, speaking for the Court, stated that:

"The proper procedure, we conclude, is for the applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized need. If that is done, the burden shifts to the applicant to demonstrate that it is better equipped to meet the distinct needs of the shipper than the protestants." 368 U.S. at 90, 82 S.Ct. at 210.

In its opinion in the present case the Commission held, inter alia, that the plaintiff failed to meet its initial burden of proof of establishing a prima facie case of distinct need and consequently that the plaintiff also failed to establish that it could provide better service than could the protestants:

"Our analysis of the record convinces us that applicant has failed to establish [1] that there is anything distinct or specialized about this service that differs essentially from that offered by motor common carriers, or [2] that applicant is better able to meet the shipper's transportation requirements than are protestants. * * * Thus, considering those transportation requirements involving service, we conclude that the record fails to show that shipper has any distinct needs which can be better met by applicant than by the protestants." 106 M.C.C. at 283.

For the reasons hereinafter set forth, we conclude that the record fails to disclose substantial evidence to support the Commission's determinations. Our examination of the plaintiff's evidence relevant to distinct need and the protestants' rebuttal thereof persuades us that the plaintiff has fulfilled its burdens of proof as required by I. C. C. v. J-T Transport, supra.

### A. The plaintiff's evidence to establish distinct need.

■ The ICC gave only brief treatment to the plaintiff's presentation:

"The crux of shipper's support stems from its desire to have the services of an irregular-route motor carrier able to perform a multiple pickup and delivery service throughout the shipper's distribution area at a single and economical rate structure. Other alleged advantages of applicant's proposed service include shipper advertising on applicant's vehicles and the assistance rendered by applicant's drivers on loading and unloading as well as a general familiarity with shipper's products which helps to expedite delivery." 106 M.C.C. at 282–283.

Continental's first argument to establish distinct need or specialized service is that Roberts requires a flexible, single-line, multiple pickup and delivery service with numerous stops-in-transit in order to service its customers adequately. Both the ICC and the other defendants apparently recognize that these requirements exist, but they argue that such requirements can be adequately supplied by the existing common carriers. This does not answer the queston of whether these requirements constitute elements of distinct need, however,

unless distinct need is defined as service that cannot be performed by existing carriers. But if distinct need is so defined, the second part of the procedure outlined above in I. C. C. v. J-T Transport becomes wholly superfluous.[3] It seems to us that the desire to have a flexible multiple pickup and delivery service, including numerous stops-in-transit, is of considerable help to the plaintiff in fulfilling its initial burden of proof with respect to "distinct need".

The plaintiff's second contenton relates to the operation of several public warehouses by Roberts. The record indicates that, as a result of the temporary authority granted to Continental, Roberts has been able to eliminate one of its warehouses and plans to close at least two others if permanent authority is granted, thereby effecting substantial cost savings. Furthermore, the carrier intends to station equipment at the widely dispersed production facilities of the supporting shipper. This would further enable Roberts to reduce warehouse costs.

Another factor offered by the plaintiff to establish distinct need involves advertising placed upon the vehicles dedicated to Roberts' use. The ICC has previously recognized that advertising may be an important factor in establishing the distinct need necessary to a finding that a proposed operation is consistent with the public interest. Meat Packers Express, 100 M.C.C. 401 (1966). It is clear from the record that advertising of a very conspicuous nature is carried by at least two of the vehicles assigned to the exclusive use of Roberts. And as will appear more fully later in this opinion, it is not a normal practice for common carriers to display on their trucks advertising of the customers whose goods they are transporting.

One of the plaintiff's principal arguments to establish distinct need stems from the actions of its drivers. The drivers used by Continental for Roberts maintain a general familiarity with the various customers and their inventories. They load orders in sequence for delivery and perform unloading services from time to time, including segregation of deliveries in various bins at destinations. The services herein mentioned have been held to be 'transportation services', Griffin Mobile Home Transportation Co., 103 M.C.C. 482 (1966), and are highly relevant to whether or not distinct need may be established.

In Tractor Transport, 98 M.C.C. 335 (1965), the ICC mentioned, in support of its finding of distinct need, that the applicant carrier would station equipment at the shipper's facilities, that the drivers would be familiar with the shipper's product, and that single-line service would be available to all points. In *Meat Packers Express, supra*, the ICC looked to the stationing of equipment at shipper's plants, advertising and multiple deliveries. Drivers services were mentioned in Nationwide Carriers, Inc., 92 M.C.C. 1 (1963), Griffin Mobile Home Transportation Co., 103 M.C.C. 482 (1966), and Earl Dibble, 92 M.C.C. 610 (1963). In the present case the plaintiff has shown the presence of all of the above factors. Although any one of them standing alone might not be sufficient, taken together they indicate to us that the plaintiff has met its initial burden of proof of showing distinct need.

B. *The defendants' arguments.*

One of the principal items of evidence on which the Commission relies to support its finding that the plaintiff failed to establish distinct need, is a statement made by an officer of Roberts in the proceedings before the hearing examiner, that the extent of utilization of Continental would be dependent upon

---

3. According to I.C.C. v. J–T Transport Co., once an applicant establishes distinct need he need not prove that he is better equipped than the protesting carriers to meet the shipper's needs, until the pro-testants have first shown that they have the ability and the willingness to meet that need. *See* I.C.C. v. J–T Transport Co., 368 U.S. 81, 90, 82 S.Ct. 204 (1961).

the establishment of a permanent sales policy and the approval of its customers. We think that the context in which this statement was made substantially diminishes the importance given to it by the ICC.[4] By itself, the statement fails to provide a basis for the Commission's adverse finding.

■ Another argument that appeared both in the ICC opinion and the various briefs filed in this action is that even if the application were granted, the protesting carriers would continue to handle the less-than-truckload traffic of Roberts. The ICC stated that this fact "refutes the assertion that the proposed service is tailored to meet the shipper's 'distinct need.'" 106 M.C.C. at 283. In Earl Dibble, 92 M.C.C. 610, 614 (1963), the Commission, in granting a contract carrier permit, expressed little concern for the fact that the supporting shipper planned to continue to use common carriers for certain types of shipments. The ICC does not explain its statement in this case, and this court is unable to ascertain how the fact that common carriers will continue to transport less-than-truckload traffic refutes the assertion that the proposed service is tailored to meet the shipper's distinct need with respect to its primary transportation requirements.

The defendant carriers' position with respect to the multiple pickup and delivery and stop-in-transit services is that *collectively* they can provide them. However, the record shows that the intervening defendants make a significant extra charge for each intermediate stop and multiple pickup or delivery. The obvious inference is that such services are not those of the ordinary variety, but rather are of a specialized nature.

The defendants make two contentions with respect to the use of advertising on vehicles used by Roberts. They first assert that the vehicles will not always be used to carry Roberts' equipment. However, it appears from the record that the use of the trucks for other shippers, for example to haul exempt commodities, requires the prior approval of Roberts. Moreover, regardless of whose merchandise is actually within a truck that bears Roberts' name, Roberts will obviously reap the benefits of the advertising provided. Thus, the argument that the trucks might carry goods of others does not weaken the plaintiff's case.

■ The intervenors next assert that they could provide the advertising space. In the first place, the fact that they might be able to provide the service is not pertinent to whether or not the desire to have it helps to establish distinct need. Secondly, the carriers have stated that they would be obliged to apply to the Commission to secure special approval to carry such advertising. This would imply that such a service is of a specialized, rather than of an ordinary nature.[5]

---

4. The witness was asked whether his company was prepared to enter into a long-term bilateral contract governing the terms and conditions of transportation if authority were granted; and the witness, after an objection had been overruled, answered in the affirmative. Plaintiff's attorney then asked, "IN [sic] the event this Application is approved, what are your plans as traffic manager of Roberts with respect to your continued use of *rail and motor common carrier service?*" (Reporter's Transcript at 187–188) (Emphasis added.) The witness answered that he had been advised that the extent of utilization of the contract carrier service was dependent upon the establishment of a permanent sales policy. The hearing examiner recognized that the answer was not responsive, but after objection, ruled that the plaintiff's attorney could not object to an answer of his own witness. (Reporter's Transcript at 188.)

5. It is also unlikely that the tonnage of Roberts is sufficient to give it the bargaining position with a common carrier, which certainly will use its equipment for many shippers, to induce a common carrier to go before the ICC to obtain advertising authority. A common carrier cannot discriminate in any of the services it offers to its customers. Thus,

In light of the foregoing, this court is obliged to conclude that the record·fails to disclose substantial evidence to support the Commission's findings with respect to this criterion.

## III. THE EFFECT WHICH GRANTING THE PERMIT WOULD HAVE UPON THE SERVICES OF THE PROTESTING CARRIERS.

■ With respect to this criterion, the ICC found that "protestants collectively are handling a substantial portion of shipper's traffic which would be subject to diversion in the event of a grant of the instant application." 106 M.C.C. 284. The crucial issue with respect to this finding is whether the traffic handled by the protestants would be subject to diversion, assuming *arguendo* that it constitutes a substantial portion of the shipper's traffic. Before temporary authority was granted to the applicant, Roberts used a shippers' association almost exclusively to transport truckload shipments, and it used common carriers to transport less-than-truckload shipments. But, the ICC states that if permanent authority were granted " * * * protestants will continue to handle less-than-truckload traffic while applicant generally will handle only truckload traffic. * * * " 106 M.C.C. at 283. Thus, this court can find in the record no indication that there would be any diversion at all. Of course, throughout all of the proceedings the intervening common carriers have indicated a desire to handle *all* of Roberts' traffic, but as it does not appear that they ever enjoyed that business, we can find no diversion. See I. C. C. v. J-T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).

Moreover, throughout the proceedings the shipper has stated that if the application is denied, it will use proprietary or private carriage rather than the common carriers. If this were to happen, the common carriers would not be given any of Roberts' truckload traffic, even if the application is denied. The intervening carriers challenge the contention that Roberts would initiate a private carriage operation, saying that Roberts is merely trying to bootstrap its support for Continental. However, the transcript indicates that some studies have taken place with respect to private carriage, and the record also indicates that prior to the use of the applicant's services Roberts used a shippers' association, the costs of which would be comparable to those of private carriage, especially if the private carriage were undertaken with leased vehicles and drivers from a driver service. This court therefore concludes that there is no substantial evidence in the record to support the ICC's conclusion as to criterion number three.

## IV. THE EFFECT WHICH DENYING THE PERMIT WOULD HAVE UPON THE APPLICANT AND/OR ITS SHIPPER.

■ The ICC expressly found that no showing had been made that the applicant could provide service at a lower cost to the shipper than could the protesting common carriers. The shipper contends, however, that it will also suffer non rate-related adverse consequences if permanent authority is denied; that it will be forced to reopen a warehouse and forego the closure of others; that it will lose flexibility of service; and that it will lose the advertising advantages and the familiarity of the drivers with its products and its customers. The ICC does not deal with these non rate-related effects. With respect to the rate-related effects, it stated that:

"Clearly protestants, in order to participate in shipper's traffic, are willing at least to consider establish-

---

if the carrier offered facilities for advertising to Roberts, it would be required to offer the same facilities on essentially the same terms to other shippers

within the industry. *See* Tractor Transport, Inc., 98 M.C.C. 335, 338–339 (1965).

ing rates lower than the rates which shipper understands to be in effect at present and the possibility of establishing a rate equivalent to that contemplated by applicant remains utterly unexplored." 106 M.C.C. at 284. However, there was evidence in the record that Roberts had requested one of the protesting carriers to establish commodity rates in 1965, and that the rates were useless because of numerous exceptions.

Although this court is not satisfied that the findings of the Commission with respect to this criterion are either complete or correct, in light of the limited scope of review in cases of this type, we conclude that as to this criterion there is sufficient evidence in the record to support the ICC's finding.

## V. THE CHANGING NATURE OF THE SHIPPER'S REQUIREMENTS.

The ICC opinion stated:

"Although shipper instituted a change in sales policy in 1965 which allegedly necessitates a change in distribution of its products, there is no evidence of record to lead to the belief that protestants will be unable to meet shipper's potentially new distribution requirements." 106 M.C.C. at 284.

While the case law is somewhat sparse in this area, one case, William P. Bursch, 91 M.C.C. 953, 958 (1963), suggested that seasonal peaks and expansion were factors to be considered, and another, Earl Dibble, 92 M.C.C. 610, 617 (1963), indicated that wide geographical locations of customers and product distribution patterns were factors to be considered.

■ The record shows that the shipper is pursuing a policy of expansion with respect to present products and is engaged in an active acquisition program to diversify its industrial field.

Furthermore, the shipper's customers are located over a wide geographical area and its distributors are frequently changed. Thus, the factors mentioned in *Bursch* and *Dibble* appear to be present here. The position of the ICC that "there is no evidence of record to lead to the belief that the protestants will be unable to meet shipper's potentially new distribution requirements", 106 M.C.C. at 284, indicates that the Commission has misallocated the burden of proof. Once the changing nature of a shipper's requirements is established, the burden then shifts to the common carriers to show that they could, in all probability, meet those requirements. There is no affirmative evidence of that ability in the record. Requiring the applicant to show not only that a shipper's requirements would change, but also that the common carriers could not meet those changes, places too great a burden upon the applicant. The latter can have very little access to information that would allow it to show whether or not the common carriers would be able to handle future requirements. See I. C. C. v. J-T Transport Co., 368 U.S. 81, 90, 82 S.Ct. 204 (1961).

■ This court therefore finds both that the ICC misallocated the burden of proof as a matter of law and that there is no substantial evidence in the record to sustain the ICC's finding on this criterion.

This court is mindful of the limited scope of review here. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). However, it is forced to conclude that, except for the fourth criterion, the record fails to disclose substantial evidence to support the Commission's findings.

The decision of the Commission is reversed and the cause remanded for further proceedings consistent with this opinion.